CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
08/12/2019
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

JANICE A. MOORE, ON BEHALF OF HERSELF
AND A CLASS OF ALL SIMILARLY SITUATED
PARTICIPANTS IN THE VIRGINIA COMMUNITY
BANKSHARES, INC. EMPLOYEE STOCK
OWNERSHIP PLAN,

       Plaintiff,

    v.

Case No. 3:19-cv-00045

VIRGINIA COMMUNITY BANKSHARES, INC.,

    Serve Registered Agent:

    A. Preston Moore, Jr.
    114 Industrial Drive
    Louisa, VA 23093

VIRGINIA COMMUNITY BANK, INC.,

    Serve Registered Agent:

    A. Preston Moore, Jr.
    114 Industrial Drive
    Louisa, VA 23093

A. PIERCE STONE,

    Serve at:

    306 Club Road
    Louisa, Virginia 23093

RONALD S. SPICER,

    Serve at:

    142 Old Tolersville Road
    Mineral, Virginia 23117

1

JOHN A. HODGE, and

    Serve at:

    300 Club Road
    Louisa, Virginia 23093

H.B. SEDWICK, III,

    Serve at:

    13595 Sedwick Lane
    Orange, Virginia 22960-2840

      Defendants.

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF
## <u>THE EMPLOYEE RETIREMENT INCOME SECURITY ACT</u>

Plaintiff Janice A. Moore, by her undersigned attorneys, brings this class action against Defendants under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* ("ERISA")*,* on behalf of herself and a class of similarly situated participants in, and beneficiaries of, the Virginia Community Bankshares, Inc. Employee Stock Ownership Plan (the "ESOP" or the "Plan"), to restore losses to the Plan, disgorge any profits through the use of Plan assets, and to obtain other remedial and appropriate equitable relief to redress violations and enforce the provisions of Title I of ERISA.  Plaintiff alleges, upon personal knowledge, the investigation of her counsel, and upon information and belief as to certain matters, as to which she believes substantial evidentiary support will exist after a reasonable opportunity for further investigations and discovery, as follows:

## INTRODUCTION

1.      The ESOP was sponsored by Virginia Community Bankshares, Inc. (the "Holding Company") for the benefit of the Holding Company's employees and employees of Virginia Community Bank ("VCB"), a wholly owned subsidiary of the Holding Company.

2.      These claims arise out of transactions in which Defendants knowingly and intentionally engaged in ESOP transactions of Holding Company stock (the "Stock") at prices that exceeded the fair market value of the Stock for their personal gain to the detriment of the Plan and its other participants, and additional breaches of Defendants' fiduciary duties to the Plan participants under ERISA.

3.      As alleged in more detail below, between 2006 and 2008, the Defendants: (a) fraudulently established an inflated value for the Stock to be used for ESOP transactions; (b) violated ERISA by causing the ESOP to repurchase Stock from the accounts of former ESOP participants at the inflated value; (c) leveraged the ESOP's assets to finance such repurchases with one or more non-exempt loans payable to VCB; and (d) saddled the ESOP participants with annual debt payment obligations and associated releases of high-priced shares of Stock in violation of ERISA for the remaining life of the ESOP until the final loan payment was made in 2016.

4.       Each and every one of these transactions was a "prohibited transaction" under both ERISA and the Internal Revenue Code.

5.      These transactions provided substantial financial benefits to the Holding Company, VCB, and individual Defendants at the expense of the ESOP participants.

6.      As alleged in more detail below, between 2006 and 2008, the ESOP's trustees, who, based on information and belief, had inside information that the value of Holding Company

Stock would likely decline, authorized cash distributions from the ESOP to insiders and repurchases of Stock by the ESOP from insiders at fraudulently inflated values far in excess of fair market value,  far in excess of other Stock transactions at that time, and, in fact, far in excess of the highest price at which Holding Company Stock had ever traded on the over the counter market historically.

7.      Defendant VCB, controlled by the same people who controlled the ESOP, including Defendant Stone and Defendant Spicer, was also the recipient of an illegal windfall in the form of principal and interest payments on a loan from VCB to the ESOP that violated ERISA.

8.      Defendants, including Defendant Stone and Defendant Spicer, set up the illegal loan so as to shift the costs of these ESOP distribution and repurchase transactions at fraudulently inflated values, as well as the cost of interest payable to Defendant VCB, from Defendant Holding Company to the ESOP and the ESOP participants.

9.      As the ESOP repaid VCB the interest and principal due on the illegal loan between 2007 and 2016, using annual ESOP contribution funds that should instead have been used for lower-priced Stock purchases for the benefit of ESOP participants, the fraudulently high-priced shares of Stock serving as collateral for the illegal loan were released and allocated to ESOP plan participants at per share Stock values that were often more than double the fair market value reported on participant ESOP statements.  The value of Holding Company Stock dropped sharply between 2007 and 2011, and remained much lower than the locked in, fraudulently inflated valuation assigned to ESOP participants' contributions through the ESOP's final payment on the illegal loan in 2016.   This substantially reduced the number of shares of Stock that would have otherwise been allocated to the accounts of ESOP participants between

4

2007 and 2016, and substantially reduced the amount of retirement benefit distributions made to ESOP participants from 2007 through the final distributions made in August 2018.

10.     The illegal windfall profits of Defendants, together with ESOP losses caused by the ongoing overpayments for Holding Company Stock over the life of the loan under Defendants' illegal loan scheme, were fully paid for by ESOP participants like Plaintiff Moore, whose retirement funds in the ESOP were eviscerated as a result.  Instead of protecting the interests of ESOP participants as they were legally obligated to do under ERISA, Defendants lined their own pockets at the expense of the ESOP participants.

11.     Moreover, as alleged in more detail below, Defendants actively and fraudulently concealed their multiple violations of ERISA by (a) disclosing misleading information to the ESOP participants on their annual ESOP statements; (b) disclosing inaccurate information on annual Form 5500 filings to the Department of Labor and the Internal Revenue Service regarding the illegal loans described above; (c) maintaining a strict policy of non-disclosure and silence about the illegal ESOP transactions and the ESOP in general, contrary to their fiduciary obligations, and, via exhibitions of anger of executives like Defendant Stone, making it clear to VCB's employees that inquiries regarding the ESOP were not welcomed; and (d) deliberately limiting ESOP participants' access to ESOP documents, records, and transaction-related information.[1]

---

[1] Because of Defendants' active, fraudulent concealment of their illegal ESOP transactions in violation of ERISA, the time by which Plaintiff Moore can commence an action against them under ERISA has been extended. 29 U.S.C. § 1113 provides "that in the case of fraud or concealment, [an ERISA] action may be commenced not later than six years after the date of discovery of such breach or violation."  Moreover, the last of the series of transactions that constituted the major breach of fiduciary duty in this case, the non-exempt loan transactions, were the final payment on the loan in 2016 and the associated final release of over-priced shares of Stock serving as collateral for the loan.  29 U.S.C. § 1113 provides that an ERISA action may

12.      As of January 1, 2006, the Holding Company reported total Plan assets in the amount of $7,588,952 on its annual Form 5500 filing with the Department of Labor, of which approximately $6.7 million was invested in Stock and the balance in cash available for prudent investment by the ESOP's trustees. Between January 1, 2006 and December 31, 2016, when the ESOP was terminated, over $4 million in cash was contributed to the Plan via minimum funding required employer contributions, discretionary employer stock bonus contributions, receipts of dividends, cash investment income, and receipts from stock sales.

13.      Final distributions from the ESOP were made to the ESOP participants in August 2018. The Holding Company reported benefits paid on its 2018 Form 5500 filing in the amount of only $5,259,855.

14.      Only a relatively small part of the significant loss in Plan asset value between 2006 and 2018, approximately $1.6 million, can be attributed to a decrease in Stock value. At the beginning of 2006, the ESOP owned approximately 148,892 shares of Stock valued at $45.30 per share. In its 2017 Annual Report, the Holding Company reported that the ESOP owned 150,830 shares valued at $34.65 per share.

15.      The majority of the remaining, substantial losses in Plan asset value, together with losses attributable to the release and allocation of fraudulently high priced shares of Stock under the illegal loan, and lost earnings and interest, in an aggregate amount to be specifically determined at trial and anticipated to approach or exceed $12 million, were the direct result of Defendants' numerous and egregious prohibited transactions and failures to honor their fiduciary duties to the ESOP participants.

---

be commenced not later than "(1) six years after (A) the date of the last action which constituted a part of the breach or violation."

16.     As alleged herein, this is a clear case of self-dealing by ERISA fiduciaries –

precisely the sort of activity ERISA was enacted to prevent, replete with securities fraud, insider

trading, and numerous ERISA violations, coupled with active, fraudulent concealment.

## JURISDICTION

17.     This action arises under Title I of ERISA, 29 U.S.C., §§ 1001 *et seq.*, and is

brought by Plaintiff under ERISA § 502(a), 29 U.S.C. § 1132(a).  Plaintiff, individually and on

behalf of all Plan Participants similarly situated, seeks to recover benefits, enforce Plan

Participants' rights to benefits (29 U.S.C. § 1132(a)(1)(B)), to pursue remedies for breach of

fiduciary duty under 29 U.S.C. § 1109 (29 U.S.C. §1132(a)(2)), and obtain other appropriate

equitable relief to redress violations (29 U.S.C. §1132(a)(3)), and to recover attorneys' fees and

costs (29 U.S.C §1132(g)).

18.     This court has subject matter jurisdiction over this action pursuant to ERISA §

502(e)(1), 29 U.S.C. § 1132(e)(1).

## VENUE

19.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. §

1132(e)(2), because some or all of the events or omissions giving rise to the claims occurred in

this District, the Holding Company and VCB are headquartered in this District, and some or all

of the individuals named as Defendants reside in this district.

20.     Assignment to the Charlottesville Division of the Western District of Virginia is

proper pursuant to Western District of Virginia Local Rules 2(a)(3) and 2(b), because a

substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this

division.

## PARTIES

21.     Plaintiff Janice A. Moore is a resident of Louisa, Virginia and was employed by VCB for over 33 years.   She held various positions during her long career at VCB, culminating with the position of Branch Manager of VCB's Mineral branch, one of the bank's two busiest branches.  Plaintiff Moore was a valued employee of VCB who maintained good relationships with both VCB's banking customers and its employees for many years.  She resigned from her position on May 1, 2018.  At all relevant times, Plaintiff Moore was an ESOP participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), and was fully vested in Holding Company Stock allocated to her ESOP account.

22.     Defendant Virginia Community Bankshares, Inc. (the "Holding Company") is a corporation incorporated under the laws of the Commonwealth of Virginia.  The Holding Company is headquartered at 114 Industrial Drive, Louisa, Virginia 23093. At all relevant times, the Holding Company was the sponsor of the ESOP within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(21)(A), a "fiduciary" under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the "named fiduciary" of the ESOP within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

23.     Defendant Virginia Community Bank ("VCB") is a corporation incorporated under the laws of the Commonwealth of Virginia and is a wholly owned subsidiary of the Holding Company. VCB is headquartered at 114 Industrial Drive, Louisa, Virginia 23093.  VCB was at all relevant times a "fiduciary" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1021(A), because it was a participating employer in the ESOP.

24.     Defendant A. Pierce Stone ("Stone") was at all relevant times a trustee of the ESOP, a director and officer of the Holding Company, and a director and officer of VCB.  Stone

was a trustee of the ESOP until April 19, 2016.  According to annual reports he filed with the Virginia State Corporation Commission between 2006 and 2008, Stone held the positions of Director, President, and Chairman of the Holding Company between 2006 and 2008, Director, CEO, and Chairman of VCB through 2006 or 2007, and Director and Chairman of VCB between 2007 and 2008.  Stone resides in or near Louisa County, Virginia. At all relevant times, Stone was a "fiduciary" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1021(A) because he exercised discretionary authority and control over the administration of the ESOP, and he exercised discretionary authority and control over the management of ESOP assets.

25.     Defendant Ronald S. Spicer ("Spicer") was at all relevant times a director and officer of the Holding Company, a director of VCB, and, until 2007 or 2008, an officer of VCB. According to annual reports filed with the Virginia State Corporation Commission between 2006 and 2008, Spicer held the positions of Director and Vice President of the Holding Company between 2006 and 2008, Director of VCB between 2006 and 2008, and Senior Vice President of VCB until 2007 or 2008.  Spicer resides in or near Louisa County, Virginia. At all relevant times, Spicer was a "fiduciary" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1021(A), because he had and exercised discretionary authority and responsibility with respect to the management and administration of the ESOP.

26.     Defendant John A. Hodge ("Hodge") was at all relevant times a trustee of the ESOP and a director of the Holding Company.  Hodge was a trustee of the ESOP until November 1, 2016.  Hodge resides in or near Louisa County, Virginia. At all relevant times, Hodge was a "fiduciary" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1021(A), because he had, and exercised, discretionary authority and control over the administration of the

ESOP and he had, and exercised, discretionary authority and control over the management of
ESOP assets.

27.     Defendant H. B. Sedwick, III ("Sedwick") was at all relevant times a trustee of
the ESOP.  Sedwick was a trustee of the ESOP until November 1, 2016.  Sedwick resides in or
near Louisa County, Virginia. At all relevant times, Sedwick was a "fiduciary" within the
meaning of ERISA § 3(21)(A), 29 U.S.C. § 1021(A) because he had, and exercised,
discretionary authority and control over the administration of the ESOP and he had, and
exercised, discretionary authority and control over the management of ESOP assets.

28.     As fiduciaries, all Defendants were "parties in interest" within the meaning of
ERISA § 3(14), 29 U.S.C. § 1002(14).

<h3 align="center">CLASS ACTION ALLEGATIONS</h3>

29.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(1) and
b(2) of the Federal Rules of Civil Procedure on behalf of the following proposed "Class" or
"Class Members":

> "All persons who were participants in the ESOP between January 1, 2006 and December
> 31, 2018 (the "Class Period"), including any former participant who had not received a
> full distribution of his or her ESOP account as of January 1, 2006."

Upon completion of discovery with respect to the scope of the Class, Plaintiff reserves the right
to amend the Class definition. The foregoing Class Members do not include Defendants, their
successors, assigns or legal representatives, the Plan Administrators, their parents, subsidiaries
and affiliates.

30.     **Numerosity**: The Plaintiff Class is so numerous that joinder of all members is
impracticable at this time. Although the exact number and identities of members of the Plaintiff
Class are unknown to Plaintiff at this time, the Form 5500 filings for the Plan filed indicate the

10

ESOP had up to 90 participants during the period in question, and had 78 participants as of January 1, 2018. Former participants injured by Defendants' actions will also be members of the Plaintiff Class.

31. **Commonality**: Questions of law and fact common to the Plaintiff Class as a whole include, but are not limited to, the following:

a. Whether each Defendant was a fiduciary under ERISA for the ESOP.

b. Whether each Defendant was a party in interest under ERISA with respect to ESOP transactions.

c. Whether Defendants Stone, Hodge, and Sedwick served as trustees of the ESOP in transactions involving the acquisition of Holding Company Stock by the ESOP and loans to the ESOP to finance such acquisitions.

d. Whether Defendants engaged in one or more prohibited transactions under ERISA in transactions involving the repurchase of Holding Company Stock by the ESOP.

e. Whether Defendants engaged in one or more prohibited transactions involving the distribution of Holding Company Stock and/or cash distributions from the ESOP.

f. Whether Defendants engaged in one or more prohibited transactions under ERISA in transactions involving the redemption of Holding Company Stock from the ESOP.

g. Whether Defendants engaged in one or more prohibited transactions under ERISA by leveraging the ESOP with one or more loans from VCB or the Holding Company to finance such repurchase, distribution, and/or redemption transactions.

h. Whether Defendants Stone, Hodge, and Sedwick caused the ESOP to pay more than adequate consideration for Holding Company Stock.

i.      Whether Defendants Stone, Hodge, and Sedwick engaged in a good faith valuation of Holding Company Stock in connection with all ESOP transactions.

j.      Whether Defendants engaged in one or more prohibited transactions under ERISA by receiving consideration for their own account in connection with one or more ESOP loan transactions, and the identification of such Defendants.

k.      Whether Defendants intentionally did not disclose material information about the ESOP, including ESOP loan transactions, on annual Form 5500 filings.

l.      Whether Defendants breached their fiduciary duties to the Plaintiff Class under ERISA by failing to act prudently and in the best interest of the ESOP participants and beneficiaries.

m.      The amount of losses suffered by the ESOP and the Plaintiff Class as a result of Defendants' violations of ERISA.

n.      The amount of profits, fees, and, with respect to VCB, interest, received by Defendants in connection with ESOP transactions, and whether such profits, fees, and interest should be disgorged to the ESOP.

32.      **Typicality**: Plaintiff's claims are typical of those of the Plaintiff Class. Like Plaintiff Moore, all members of the Plaintiff Class were deprived of hard-earned retirement benefits due to the diminution in the value of their ESOP accounts as a result of Defendants' actions in violation of ERISA.

33.      **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Plaintiff Class. Plaintiff has retained counsel competent and experienced in complex financial litigation, ERISA, and laws applicable to employee stock ownership plans.

12

34.     Class certification of Plaintiff's claims for relief for violations of ERISA is appropriate pursuant to Rule 23(b)(1) because the prosecution of separate actions by individual members of the Plaintiff Class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

35.     The names and addresses of all members of the Plaintiff Class are available from the ESOP plan records maintained by the Holding Company and VCB. Notice will be provided to all members of the Plaintiff Class to the extent required by Rule 23(b)(1).

36.     Class certification is further warranted under Rule 23(b)(2) because Plaintiff seeks declaratory and injunctive relief on behalf of Class Members on grounds generally applicable to the entire Class to recover benefits, enforce their rights to benefits and to pursue remedies for breach of fiduciary duty under 29 U.S.C. § 1109 (29 U.S.C. §1132(a)(2)), and obtain other appropriate equitable relief to redress violations (29 U.S.C. §1132(a)(3)), and to recover attorneys' fees and costs (29 U.S.C §1132(g)).

## FACTUAL ALLEGATIONS

### The ESOP

37.     The factual allegations made above are incorporated herein by this reference.

38.     The ESOP was established by the Holding Company effective as of January 1, 1983 and was terminated by the Holding Company effective as of December 31, 2016.

39.     The ESOP was a retirement plan governed by ERISA and the Internal Revenue Code of 1986, as amended (the "Code").

40.     The ESOP was a "defined contribution" and "individual account" plan within the meaning of ERISA 3(34), 29 U.S.C. 1002(34) in that the Plan had individual accounts for each

participant and benefits were based solely upon the amount contributed to those accounts by VCB, and income, expenses, gains, and losses allocated to the accounts.

41.     The Plan was administered by the Board of Directors of the Holding Company and the Board of Directors of VCB.

42.     The Holding Company's Board of Directors was authorized to appoint, and did appoint, Defendants Stone, Hodge, and Sedwick to serve as the trustees of the ESOP (individually each a "Trustee" and collectively the "Trustees").

43.     Substantially all of the Plan assets were invested in Holding Company Stock. At all times, the ESOP owned less than twenty-five percent (25%) of the issued and outstanding shares of the Holding Company.

44.     The ESOP was a combination money purchase pension plan and a stock bonus plan. Pursuant to minimum funding standards established under Section 412 of the Code, the plan sponsor of a money purchase pension plan is required to make an annual contribution to the plan on behalf of the plan participants, with the amount of such contribution established by the terms of the plan. The ESOP's money purchase formula contained in its governing documents required VCB to contribute ten percent (10%) of the compensation payable to each VCB employee who was a participant in the ESOP to fund the retirement benefits promised to employees under the plan.

45.     Each ESOP participant's account was credited with an allocation of ten percent (10%) of participants' compensation as of December 31 each year.  VCB had discretion to make stock bonus contributions to supplement the money purchase contribution. In addition, participants received dividends on the Stock allocated to their ESOP accounts.

46.     Under the Code, all ESOP contributions are classified as compensation and, therefore, were tax deductible by VCB as compensation expense up to a limit established under Section 404 of the Code, which limit capped deductible contributions to the ESOP plus any other defined contribution plan sponsored by the Holding Company or VCB (e.g., the VCB 401(k) plan) at twenty-five percent (25%) of the compensation paid to employees participating in such plans.

47.     The Trustees had full discretion to invest the ESOP contributions and dividends allocated to the ESOP participant accounts, subject to compliance with their ERISA fiduciary duties.

48.     Each year, the ESOP participants received an ESOP statement that disclosed the value of Stock and cash allocated to their accounts as of December 31 each year.

49.     Under Code Section 401(a)(28)(C), an "independent appraiser" must perform all valuations of securities held by an ESOP that are not readily tradeable on an established securities market. Valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities. 29 C.F.R. § 54.4975-11(d)(5).  For transactions not involving a party in interest, value may be determined as of the most recent valuation date. Generally, for transactions between a plan and a party in interest (including, e.g., Defendants Stone, Spicer, Holding Company, and VCB), value must be determined as of the date of the transaction, and an independent appraisal is required.

50.     Throughout the Class Period, Holding Company Stock was thinly traded on the so-called "pink sheet" or over-the-counter market.  This market has never been considered by either the Department of Labor or the Internal Revenue Service as an "established securities market" for

ESOP purposes. 26 C.F.R. § 1.401(a)(35)-1(f)[2]; Treas. Reg. § 54.4975-7(b)(1)(iv). *See also* IRS

Private Letter Ruling 9036039 and IRS Private Letter Ruling 200052014.

51.     Accordingly, the ESOP Trustees were generally required to engage an independent

appraiser to determine the value of Stock held by the ESOP for purposes of the annual valuation

and for any transaction with a party in interest, including the Defendants. 26 C.F.R. §

1.401(a)(35)-1(f); Treas. Reg. § 54.4975-7(b)(1)(iv). *See also* IRS Private Letter Ruling 9036039

and IRS Private Letter Ruling 200052014.

52.     The ESOP Trustees were responsible for selecting the independent appraiser,

disclosing all material financial information needed to prepare the appraisal, and for accepting or

rejecting the appraisal following a good faith review of the appraisal.

53.     In addition to providing the ESOP participants with information about their ESOP

accounts, the annual valuation was used to determine the amount to be distributed to the ESOP

participants who retired or otherwise separated from service with VCB and/or the Holding

Company during the Plan year. For example, the value of Stock allocated to a participant who

retired in 2006 was based on the December 31, 2006 valuation.

54.     The annual valuation was also used for purposes of preparing the ESOP financial

statements filed with the Department of Labor each year on Form 5500.

55.     Upon a termination of employment, ESOP participants could elect to receive a

distribution of their account in cash or Stock. If a participant elected a cash distribution, the

---

[2] The term "readily tradable on an established securities market" under Code Section 409(l) has
the same meaning as "publicly traded" under 29 C.F.R. § 54.4975-7(b)(1)(iv), which refers to a
security that is listed on a national securities exchange registered under Section 6 of the
Securities Exchange Act of 1934 (the "Securities Exchange Act") or that is quoted on a system
sponsored by a national securities association registered under Section 15A of the Securities
Exchange Act.

Holding Company had an obligation to repurchase the Stock allocated to the participant's ESOP account. This is commonly referred to as an ESOP plan sponsor's "repurchase obligation." The repurchase obligation could be satisfied by either distributing the Stock to the former participant and simultaneously redeeming the Stock for cash, or by using cash allocated to the accounts of the other ESOP participants to repurchase and recirculate the shares among the active participants.

56.     The right of ESOP participants to diversify the investment of their accounts is limited. An ESOP participant had no right whatsoever to diversify his or her account until the participant had met two requirements: (a) the participant must have attained age 55, and (b) the participant must have participated in the Plan for 10 or more years.  Code Section 401(a)(28)(B) refers to a participant who has met these requirements as a "Qualified Participant." A Qualified Participant can diversify his or her account over a six-year period. During the first five years, in any one or more of those five years, the Qualified Participant can diversify up to a cumulative of twenty-five percent (25%) of the Stock allocated to his or her ESOP account.  In the sixth year, the percentage increases to fifty percent (50%).  For purposes of the diversification right, Stock value is determined by the annual valuation immediately preceding the diversification date. Given these limited diversification rights, and the fact that the only two investment options under the ESOP were Holding Company Stock and a money market account, the retirement benefit for the vast majority of the ESOP participants was almost entirely dependent on the value of Holding Company Stock.

## The December 31, 2006 Annual Valuation

57.     The Trustees reported a Stock value of $55.00 per share of Stock to the participants on the annual ESOP statement for the Plan year ending December 31, 2006, representing an increase of over 21% as compared to the December 31, 2015 value of $45.30.

58.    The Form 5500 for the 2006 Plan Year reported ESOP Stock holdings valued at $8,194,010. Based on the $55.00 per share value, the number of shares held by the ESOP was therefore 148,892.

59.    By the end of 2007, the per share value had fallen to $39.15 and the value of ESOP Stock holdings had decreased to $5,997,389.  Stock holdings had increased by 4,208 shares.

60.    In June 2017, Plaintiff Moore obtained from VCB co-founder and former Board member Goodman Duke a copy of a March 19, 2007 valuation letter, attached hereto as **Exhibit A** (the "Valuation Letter").  The Valuation Letter states that the ESOP Trustees had engaged Howe Barnes Hoefer & Arnett, an investment bank, in early 2007 to provide an opinion as to the estimated fair market value of 75,000 shares of Holding Company Stock as of December 31, 2006 "to be used in connection with the ESOP."  The Valuation Letter does not state that its purpose was the annual valuation, or that its purpose was to provide an opinion on the 148,892 shares held by the ESOP.  The Valuation Letter purported to establish a value of $55.00 per share of Holding Company Stock as of December 31, 2006.

61.     Holding Company Stock had never traded on the pink sheet market at a price as high as $55.00 as of December 31, 2006.  In fact, on December 29, 2006, just two days prior to the valuation date, the Stock price was $44.00 per share, with 688 shares of Holding Company Stock traded that day.  The appraisal value of $55.00 per share as of December 31, 2006 was thus a full 25% higher than the most recent over-the-counter ("OTC") market trade to that date. Based on information and belief, because of negative information concerning the Holding Company and VCB known to Defendants, but not publicly disclosed, even the December 29,

2006 OTC market trades were at prices that exceeded the fair market value of Holding Company shares of Stock.

62.     At all relevant times, Defendants had a fiduciary duty to their shareholders, including the ESOP and its participants, under both corporate law and ERISA, to have a full and honest understanding of the financial condition of the Holding Company and its subsidiary, VCB.  Defendants were further obligated as fiduciaries to act in a manner consistent with such full and honest understandings.

63.     The ESOP Trustees were responsible for selecting the independent appraiser, disclosing all material financial information needed to prepare the appraisal, and for accepting or rejecting the appraisal following a good faith review of the appraisal.

64.     Based on information and belief, at the time of the March 19, 2007 Valuation Letter, the Holding Company and VCB were facing serious problems, including defaults or anticipated defaults on one or more large loans that were highly unlikely to be repaid, that would negatively impact the value of Holding Company Stock.

65.     As a further indication of the problems facing the Holding Company and VCB in 2007, the financial condition of the Holding Company and VCB were in such dire straits that by 2010, the Virginia State Corporation Commission (the "Commission") and the Federal Reserve Bank of Richmond (the "Federal Reserve") commenced an extensive examination of their operations (the "Examination"). The Examination resulted in a Compliance Agreement dated June 29, 2011 among the Commission, the Federal Reserve, the Holding Company, and VCB (the "Compliance Agreement"), which revealed long-standing patterns of operational and compliance problems and regulatory violations.  Among the serious problems identified by the Commission and the Federal Reserve were the following: insufficient Board oversight of the

management and operations of VCB in areas such as credit risk management, lending, and credit administration, problems related to lending administration, problems related to loan grading, problems related to deficiencies in allowances for loan and lease losses, noncompliance with regulatory capital ratio requirements, problems with budgeting, information technology deficits, and noncompliance with laws and regulations in general. These serious problems did not appear overnight, but represented ongoing problems predating the Examination. The Compliance Agreement prohibited the Holding Company from declaring dividends or redeeming Holding Company Stock without the approval of the Commission and the Federal Reserve.

66. Based on information and belief, the extensive issues adversely affecting the financial condition of the Holding Company at the commencement of the Examination on May 3, 2010 and identified in the June 29, 2011 Compliance Agreement, as well as other similar negative issues, were in existence on December 31, 2006, and Defendants knew or should have known then that these issues would likely have a material adverse effect on the value of Holding Company Stock in 2007 and beyond.

67. Based on information and belief, the Defendant ESOP Trustees, including Defendant Stone, and other Defendants, including Defendant Spicer, concealed material negative information in their possession regarding the financial condition of the Holding Company and VCB from Howe Barnes Hoefer & Arnett, the Holding Company's shareholders, and the general public, which information said Defendants knew or should have known would have had a material adverse impact on the value of Holding Company Stock.[3]

---

[3] As recounted in further detail elsewhere in this Complaint, for many years Defendants have engaged in active, fraudulent concealment of the details surrounding the ESOP transactions that are the basis for Plaintiff's ERISA claims brought herein. Plaintiff has diligently sought relevant records and information from Defendants, but Defendants have provided only limited

68.     Based on information and belief, Defendants, including Defendant Stone, intentionally and dishonestly obtained the fraudulently inflated valuation reflected in the Valuation Letter in 2007 specifically for the purpose of engaging in ESOP transactions that would (and did) benefit Defendants at the expense of the ESOP participants. This was the beginning of an insider trading scheme that perpetuated through at least the year 2008 with respect to repurchases by and/or cash distributions from the ESOP, and through the year 2016 with respect to related loan transactions and payments and associated releases of overpriced shares of Stock, and which constitutes "fraud" within the plain meaning of ERISA § 413, 29 U.S.C. § 1113.

### 2007 Prohibited Transactions – The 2007 ESOP Loan

69.     Prior to 2007, the annual statements provided to ESOP plan participants showed cash and Stock allocated to two separate accounts: a stock purchase account and a money purchase account. The December 31, 2007 ESOP participant statements, delivered to ESOP participants in 2008, had a new account, the "Leverage Share Account," indicating that the ESOP Trustees had financed Stock acquisitions during the 2007 plan year with a loan.  As was always the case, Defendants delivered the one-page December 31, 2007 statements to ESOP participants without holding a question and answer meeting, without any discussion, and without any accompanying explanation or explanatory written materials.

---

information to her.  Plaintiff has also sought the assistance of the United States Department of Labor (the "DOL") in an effort to obtain relevant documents and information from Defendants, but Defendants withheld virtually all relevant documents from the DOL.  Consequently, the relevant documents and information available to Plaintiff are limited, and, while Plaintiff has a reasonable basis for making all of the allegations herein, she must engage in discovery in this litigation to confirm certain matters alleged in this Complaint, which matters are so denoted herein.

70.     Defendants did not communicate anything to the ESOP participants about an ESOP loan transaction in 2007.  Nor did Defendants explain the new "Leverage Share Account" included in the one-page statement to ESOP participants.

71.     Ten years later, in a letter dated April 25, 2017, VCB President and CEO Preston Moore, Jr.[4] explained to Plaintiff Moore that the December 31, 2006 per share value of $55.00 was used to calculate ESOP cash distributions to six unnamed Plan participants who retired in 2006 and received distributions in 2007.[5]  Mr. Moore's April 25, 2017 letter was in response to a February 26, 2017 letter to him from Plaintiff Moore in which she expressed concern regarding the loss in value of her ESOP benefits.

72.     In his April 25, 2017 response letter, Mr. Moore also stated:

> The Plan has three ways to satisfy its obligation to pay participants in cash. First, the company could redeem the shares, which would deplete shares available for re-distribution in the Plan. Second, the Plan may have adequate cash on hand to satisfy the distribution obligation, which will allow shares to remain in the Plan and be available for re-distribution to other Plan participants. Third, the Plan can obtain a loan to satisfy the distribution obligation, which will allow shares to remain in the Plan and be available for re-distribution to other Plan participants. In 2007, the Plan did not hold enough cash to satisfy the distribution obligation and, in accordance with Section 15.7 of the Plan, obtained a loan, which allowed the shares to stay within the Plan and be available for re-distribution. There is nothing inappropriate about this decision. Such loans are authorized by federal law and the Plan document.

---

[4]  Mr. Moore, who, in the 2006-2008 timeframe, was not yet employed by VCB, is not a Defendant in this action.  Mr. Moore is not related to Plaintiff Moore.

[5]  As discussed in more detail below, based on Line 7b of the ESOP's 2007 Form 5500 filing, only two ESOP participants retired or separated in 2007, receiving a total of $1,476,165 as disclosed on Schedule I, Line 2e of the Form 5500.  Based on information and belief, the two ESOP participants receiving this $1,476,165 were Defendants Stone and Spicer.

Mr. Moore's assessment of his predecessors' actions was wrong. In fact, nothing about the 2007 decision to implement the third option described by Mr. Moore in his April 25, 2017 letter was appropriate, as it failed to comply with both federal law and the Plan's governing documents.

73.     The obligation to repurchase Stock from a former participant who elects cash instead of Stock is an obligation of the plan sponsor, in this case the Holding Company, and not the ESOP. The Holding Company had a fiduciary duty to anticipate and manage its repurchase obligation.

74.     The Holding Company had two legally permissible alternatives to finance the repurchase obligation. As Mr. Moore stated with respect to the second option he described in his April 25, 2017 letter, if there was sufficient cash allocated to ESOP participant accounts to repurchase Stock from retired or terminated participants, the Trustees were permitted to satisfy the repurchase obligation on behalf of the Holding Company by using such cash to repurchase the shares and recirculate them to active ESOP participants. Recirculating shares is a common practice, but it requires planning on the part of plan fiduciaries sufficient to anticipate cash needs and schedule contributions to the plan accordingly. Evidently, the Defendants did not engage in such planning, and as a result, the Plan found itself with insufficient cash.

75.     The other alternative, described by Mr. Moore in his April 25, 2017 letter as the "first option," was for the Holding Company to redeem the shares directly from a terminated participant. The cash could come from the Holding Company's operating funds or from a reserve set aside by the Holding Company for the purpose of meeting this very predictable expense.  If the Holding Company did not have sufficient liquidity, it (**not the ESOP**) could have permissibly borrowed money to fund the obligation.

23

76.     The "third option" described in Mr. Moore's April 25, 2017 letter was for "the Plan [to] obtain a loan to satisfy the distribution obligation."  This so-called "third option" is the course that the Defendants took.

77.     In fact, this so-called "third option" was not an option at all; rather, it was a prohibited transaction and *per se* violation of ERISA.  As a general rule, Section 406(a)(1)(B) of ERISA prohibits plan loans. Section 408(b)(3) provides that a loan to an ESOP is exempt from Section 406 of ERISA (except section 406(b)(3)) if such loan is "primarily for the benefit of participants and beneficiaries of the plan, and…such loan is at an interest rate which is not in excess of a reasonable rate" and the loan meets the requirements of Section 408(b)(3) and 29 C.F.R. § 2550.408b-3. To qualify for the ESOP loan exemption, a loan between the Plan and a party in interest must be used only for one of the following purposes: (1) to acquire qualifying employer securities; (2) to repay such loan; or (3) to repay a prior exempt loan. 29 C.F.R. § 2550.408b-3(d).

78.     The Holding Company's repurchase obligation could not be satisfied with the proceeds of a loan to the ESOP to finance a sale of the shares to the ESOP for an obvious reason: the ESOP already owned the shares.  Until distributed to participants, all Stock held by the ESOP was legally owned by the Trustees in trust for the benefit of the ESOP participants.  While the Holding Company could have financed its own repurchase obligation under ERISA with a loan, the proceeds of which it could have used to purchase the shares in question from the ESOP, the ESOP could not, legally or logically, have taken out a loan to purchase shares it already owned.

79.     A repurchase of shares already held by the ESOP is not an acquisition of new shares under 29 C.F.R. § 2550.408b-3(d); it is what it says it is - a repurchase of the same shares.

80.     If the Holding Company had redeemed the shares from participants who became entitled to a distribution following a 2006 termination or retirement, using its cash reserves or funds borrowed by the Holding Company to pay for the shares, the redemption price would have been based on the December 31, 2006 value (assuming it was accurate and determined in good faith).

81.     After such redemption, and assuming the Trustees determined it was in the best interest of the Plan participants to replenish the ESOP with Stock, the ESOP's Trustees could have purchased shares of Stock from the Holding Company and financed this purchase with a loan, but with one important caveat: the purchase price needed to be based on the fair market value of Holding Company Stock **as of the transaction date in 2007** – not as of the December 31, 2006 valuation.

82.     A fundamental requirement for ESOP transactions with a party in interest is that fair market value must be determined **as of the date of the transaction.**  S. Rep.  No. 938, 94th Cong., 2d Sess. 49, 218 (1976); *see also* Prop. 29 C.F.R. § 2510.3(-18(b)(2)(ii).[6] Defendants, therefore, were not permitted to rely on the December 31, 2006 valuation, even if had been accurate and determined in good faith, for the purpose of setting the purchase price for the **acquisition** of any shares by the Plan during 2007, whether directly or financed by a loan.

83.     Any loan to the ESOP in 2007 to repurchase shares of Stock from retired or terminated participants based on the December 31, 2006 valuation was a *per se* prohibited transaction.

---

[6] The Department of Labor proposed a regulation defining adequate consideration under ERISA § 3(18) in 1988. Although this proposed regulation has not been made final, it provides the most definitive available guidance for valuation of closely held ESOP stock and is generally relied upon by ESOP fiduciaries and independent appraisers.

84.     The Trustees engaged in such a prohibited transaction and thereby saddled the ESOP participant accounts with debt from which they never recovered.

### The 2007 Prohibited Transactions – Fiduciary Self-Dealing

85.     A plan sponsor is required to disclose the number of retired or separated participants who received benefits during the plan year on Line 7b of the annual Form 5500 filing.

86.     The ESOP's Form 5500 filing for the 2007 Plan year disclosed that two retired or separated participants received benefits during the 2007 Plan year, not six as stated by Mr. Moore in his April 25, 2017 letter.

87.     Defendant and ESOP Trustee Stone had attained age 65 on or before December 31, 2006, and therefore he would have been entitled to a distribution of his ESOP account based on the December 31, 2006 valuation reflected in the Valuation Letter, but only if that valuation had not been fraudulently inflated and procedures required under the ESOP's governing documents and under ERISA had been followed.

88.     Defendant Spicer, who had not attained age 65 by December 31, 2006, would have been entitled to a distribution of his ESOP account based on a December 31, 2006 valuation only (a) if he had had a bona fide separation from service during the 2006 calendar year, or (b) if he was a "Qualified Participant" (as defined in the ESOP's governing documents) entitled to diversify up to 50% of his ESOP account.  Based on Virginia State Corporation filings, Defendant Spicer was still very active as an officer of VCB throughout and after 2006. According to annual reports filed with the Virginia State Corporation Commission between 2006 and 2008, Spicer held the positions of Director and Vice President of the Holding Company between 2006 and 2008, Director of VCB between 2006 and 2008, and Senior Vice President of

VCB **until late 2007 or 2008**. Thus, based on Virginia State Corporation filings, there is no indication that Defendant Spicer actually retired or separated from service in 2006.

89.     Schedule I of the Form 5500 for the 2007 plan year, disclosing certain financial information, indicated that the dollar value of benefits paid in 2007 was $1,476,165.

90.     Based on information and belief, Defendant Stone and Defendant Spicer received all or a significant portion of these cash distributions (the aforementioned $1,476,165) from the ESOP based on a fraudulently inflated per share value of $55.00 established by the Trustees (including Defendant Stone) as the annual valuation for the plan year ending December 31, 2006, thereby cashing out their ESOP accounts at a Stock valuation they knew was fraudulently inflated, while knowing further that the Stock valuation was highly likely to decline in the future, and arranging for ESOP participants other than themselves to pay for their high priced exit transaction by means of an illegal loan transaction that would force the ESOP to repay the loan in exchange for the release of the high priced shares of Stock to the ESOP, resulting in the allocation of those high priced shares to ESOP participants as the loan was repaid.

91.     No one from the Holding Company, VCB, or the ESOP disclosed any details surrounding the 2007 ESOP transactions to Plan participants in 2007, and Defendants actively concealed such details from Plan participants. However, review of Plaintiff Moore's 2007 ESOP statement shows that $8,483.79 in cash allocated to Plaintiff Moore's ESOP stock bonus and money purchase pension accounts was used to repurchase 117.1606 shares of Holding Company Stock, at a per share price of $72.83, from participants who had retired or otherwise become entitled to a distribution of their ESOP accounts. Plaintiff Moore's ESOP account statement reflects the cost basis of these shares as $80.16 per share. How such a high per share price and cost basis (far in excess of even the fraudulently inflated $55.00 per share valuation reflected in

27

the Valuation Letter) were determined is unknown, and indicative of additional transactional fraud undertaken by the Defendants in connection with the ESOP in 2007.  Upon information and belief, similar transactions were reflected on the statements of all ESOP participants.

92.     Plaintiff Moore's 2007 ESOP statement shows that $4,130.38 in cash allocated to her ESOP account was used to purchase 88.2002 shares of Holding Company Stock directly from the Holding Company or one or more of its shareholders at a per share price and corresponding cost basis of $46.82. These ESOP transactions, which are within the $42.50 - $47.50 over-the-counter market trading range for 2007, indicating that the Trustees based the purchase prices on over-the-counter market transaction pricing (versus an independent appraisal). The juxtaposition of these purchases with ESOP repurchase transactions at $72.83 or $80.16 during the same year provides further evidence of transactional fraud with respect to the higher priced transactions.  Again, upon information and belief, similar transactions were reflected on the statements of all ESOP participants.

93.     Based on information and belief, in 2007, both Defendant Stone and Defendant Spicer took cash distributions from the ESOP based on a fraudulently inflated December 31, 2006 valuation of $55.00 per share of Holding Company Stock and/or sold shares that they held outside of the ESOP to the ESOP at a sales price of at least $55.00 per share of Holding Company Stock.

94.     Defendants not only contrived a fraudulently inflated Stock price for their planned transactions, but they also went to great lengths to cover up their fraudulent scheme, knowingly engaging in active concealment to prevent ESOP participants from discovering their ERISA violations, by (i) obtaining a *cherry-picked* independent opinion letter (the Valuation Letter) that was, on information and belief, based on Defendants' fraudulent input, to lend credence to the

inflated valuation used for certain Defendants' own 2007 cash distributions and/or sales of shares; (ii) financing the 2007 transactions with a secret loan from VCB to the ESOP, the terms of which were never disclosed to ESOP participants, and taking active steps to ensure that ESOP participants did not learn of the loan terms; (iii) not disclosing the 2007 ESOP Loan on Form 5500 filings for the Plan, as required under ERISA; (iv) maintaining a strict policy of non-disclosure and silence about the 2007 ESOP transactions and the ESOP in general, contrary to their fiduciary obligations, and, via exhibitions of anger of executives like Defendant Stone, making it clear to VCB's employees that inquiries regarding the ESOP were not welcomed; (v) providing only one page annual statements to ESOP participants without any explanation thereof, and including misleading information on such annual ESOP statements; (vi) limiting ESOP participants' access to Plan documents to review, but not copy, such documents in corporate headquarters; (vii) based on information and belief, consolidating the 2007 ESOP Loan transactions with the 2008 ESOP Loan transactions defined and discussed below in an effort to hide the details surrounding each year's loan transactions and related transactions in Holding Company Stock, and providing only limited disclosure to shareholders, and no disclosure to Plan participants, regarding the consolidated loans; (viii) withholding documents and information requested by the U.S. Department of Labor during its investigation of the Holding Company and VCB; and (ix) based on information and belief, other means not reflected in the examples in subparagraphs (i) – (viii) above.

95.     Moreover, Defendants engaged in intimidation of employees who dared to inquire about ESOP transactions or seek access to Plan documents in corporate headquarters, thereby intimidating others from making such inquiries.  For example, in 2010, former VCB loan officer Andrew Wade was fired approximately two weeks after asking to review the ESOP's governing

documents, remarking to his co-workers as he packed his personal belongings on the day of his termination that "this is what happens when you ask about the ESOP."  And, in June 2017, shortly after Plaintiff Moore began making inquiries about the operation of the ESOP, Defendants initiated questionable performance charges against her.  She resigned shortly later, on May 1, 2018.

96.     In addition, when Plaintiff Moore asked Defendant Stone about the 2007 transactions over a decade later, Defendant Stone obfuscated her inquiry by claiming that he had lost money just like other Plan participants had, instead of disclosing that he had cashed out at a fraudulently inflated high price at the expense of the other ESOP participants.

97.     Plaintiff Moore had previously expressed concerns about the declining value of her ESOP benefits.  She did not begin to suspect the potential impropriety of the 2006-08 ESOP transactions, however, until late 2014 or early 2015, when VCB co-founder and former Board member Goodman Duke, visibly upset, briefly showed her a copy of the 2007 Valuation Letter.  At that point, Plaintiff Moore was not aware that the valuation was likely contrived or that Defendants had engaged in any prohibited transactions.  In fact, Plaintiff Moore did not have sufficient information to formulate a written complaint concerning Defendants' management of the ESOP until February 26, 2017, when she wrote a letter to VCB's President voicing her concerns.  Moreover, it was not until June 2017 that Mr. Duke provided her a copy of the Valuation Letter.

98.     ERISA § 413, 29 U.S.C. § 1113 provides as follows (emphasis added):

§ 1113. Limitation of actions
No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--

(1)  six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2)  three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

**except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.**

99.      Plaintiff Moore's Complaint is timely under each limitation period established for claims alleging a breach of fiduciary duty under ERISA § 413, 29 U.S.C. § 1113. With regard to the first alternative limitation period provided in 29 U.S.C. § 1113(1), the final payment on the 2008 non-exempt loan transactions, and the associated final release of over-priced shares of Stock serving as collateral for the loan, did not occur until 2016.[7] These transactions were the last of a series of prohibited transactions that caused significant losses to the Plan. Thus, the "last action which constituted a part of the breach or violation" under 29 U.S.C. § 1113(1) occurred less than four years ago, within the six-year limit provided by statute.  With regard to the second alternative limitations period set forth in 29 U.S.C. § 1113(2), as noted above, Plaintiff Moore did not have sufficient information to formulate a written complaint concerning Defendants' management of the ESOP until February 2017.  February 26, 2017, approximately two and a half years ago, is the earliest date that could possibly be considered "the earliest date on which the plaintiff had actual knowledge of the breach or violation" under 29 U.S.C. § 1113(2).

100.      Second, this action is timely under the "fraud or concealment" provisions of 29 U.S.C. § 1113 highlighted above. The facts establish that Defendants engaged in transactions

---

[7] Note 14 to the Holding Company's and VCB's Consolidated December 31, 2017 financial statements states in part: "During 2016, the ESOP paid the outstanding balance of the debt to the Company, releasing it from its leveraged position…. As of December 31, … 2016, the related obligations no longer exist."  The Holding Company and VCB do not post their annual reports and financial statements online or provide them to Plan participants.

using ESOP Stock for their personal gain based on valuations they knew were inflated. As noted above, the facts also establish that Defendants went to great lengths to conceal these transactions from the Plan participants. February 26, 2017, the date of Plaintiff Moore's written complaint, approximately two and a half years ago, is the earliest date that could possibly be considered "the date of discovery of such breach or violation" under the "fraud or concealment" provisions of 29 U.S.C. § 1113.

101.    Plaintiff Moore, like the other ESOP participants, still remains in the dark about many of the concealed details of the 2006-08 ESOP transactions.

102.    Despite all the smoke and mirrors cover-up engaged in by Defendants, it is now clear that all of the 2007 ESOP Stock transactions were prohibited transactions under ERISA because (a) the purchase price paid by the Trustees exceeded the Stock's fair market value; (b) the purchase price was not determined in good faith; (c) the purchase price was not established as of the date of the transaction; and (d) the purchase price was not determined pursuant to a valid independent appraisal.  In addition, as noted above and discussed further below, the 2007 ESOP Loan and 2008 ESOP Loan transactions were likewise prohibited under ERISA.

**2008 ESOP Prohibited Transactions – the 2008 ESOP Loan**

103.    In 2008, Defendants engaged in what appears to be more insider trading by entering into another loan transaction to repurchase shares of Stock, once again, at a price in excess of fair market value.

104.    Although the Holding Company never communicated anything to the ESOP participants about a loan *in 2008*, the Holding Company's *2017 Annual Report* to its shareholders states in a sparsely detailed footnote in the financial statements that the ESOP

"purchased" 44,888 shares of Holding Company Stock in 2008 and financed the purchase with a loan from VCB (the "2008 ESOP Loan").

105.    But, based on data in the Form 5500 filings, the year-end value of the ESOP employer securities held at the end of 2007 was $5,997,389. At the 2007 per share value of $39.15 disclosed on Plaintiff Moore's ESOP statement, the number of shares held by the ESOP at the end of 2007 was 153,190. The year-end value of ESOP employer securities at the end of 2008 was $4,253,576. At the 2008 per share value of $27.40 disclosed on Plaintiff Moore's ESOP statement, the number of shares held by the ESOP at the end of 2008 was therefore 155,240, indicating that the ESOP acquired only 2,050 shares in 2008, and not 44,888 shares.

106.    Upon information and belief, the 2008 ESOP Loan transaction was largely a refinancing of the undisclosed 2007 ESOP Loan.

107.    Based on information and belief, the initial principal amount of the 2008 ESOP Loan was approximately $2 million.

108.    As of December 31, 2007, the value of Holding Company Stock communicated to ESOP participants was $39.15 per share.  As of December 31, 2008, the value of Holding Company Stock communicated to ESOP participants was $27.40 per share. In 2008, while the value of Holding Company Stock was **going down, and not up**, the 2008 ESOP Loan blatantly ignored this reality and provided for the repurchase of Defendants' shares of Stock and/or cash distributions to Defendants for an amount totally incongruous to the actual value of the shares.

109.    Plaintiff Moore's ESOP statements for Plan years 2008 through 2016 list the cost basis of shares released to her Leverage Share Account as the loan was repaid at $44.52 per share. This indicates either that the purchase price of the shares acquired by the ESOP with the

proceeds of the 2008 ESOP Loan was $44.52 per share, or that the average price per share for the 2007 and 2008 purchases was $44.52 per share.

110.   Upon information and belief, the Defendant Trustees did not rely on an independent valuation to determine Stock value for purposes of establishing a purchase price for the shares repurchased with the proceeds of the 2008 ESOP Loan transaction, as required under ERISA Sections 406 and 408.

111.   The $44.52 purchase price, or average purchase price, established for the Stock repurchases financed by the 2008 ESOP Loan transaction, was in excess of adequate consideration.

112.   The 2008 ESOP Loan was a prohibited transaction under ERISA.

113.   The 2008 ESOP Loan was paid down during plan years 2008 through 2016, financed with tax-deductible contributions to the ESOP. During this period, based on contributions disclosed on Form 5500 filings, VCB and the Holding Company contributed over $3.4 million to the ESOP. While some of these contributions were used to fund distributions to retirees and other terminated employees, most of the money was applied to pay off the ESOP's debt.

**Fraudulent Concealment of Material Information
About the ESOP on Form 5500 Filings**

114.   Plan sponsors are required to file a Form 5500 with the Department of Labor each year. As stated on the Department of Labor Employee Benefits Security Administration website,

> The Form 5500 series is an important compliance, research, and disclosure tool for the Department of Labor, a disclosure document for plan participants and beneficiaries, and a source of information and data for use by Federal agencies, Congress, and the private sector in assessing employee benefit, tax, and economic trends and policies. The Form 5500 Series is part of ERISA's overall reporting and disclosure framework, which is intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and

34

that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries under employee benefit plans.

115.    The Holding Company filed a Form 5500 each year reporting contributions, participant data, and Plan asset information, and other information, as required by the Department of Labor and the Internal Revenue Service.

116.    For plan years prior to 2009, the Holding Company was required to include Schedule E, Annual ESOP Information, with its Form 5500 filings. Schedule E was intended to disclose material annual information regarding the ESOP.

117.    Line 10 of the Holding Company's Form 5500 filings for plan years 2006, 2007, and 2008 states that the following Schedules were attached to the filings: Schedule R (retirement plan information), Schedule E (ESOP information), Schedule SSA (Separated Vested Participant Information), and Schedule I (Financial Information – Small Plan).

118.    Schedule E is notably absent from all of the Form 5500 filings made by the Holding Company during Plan years 2006-2009. The Department of Labor public data room has no record of Schedule E filings made by the Holding Company during this period.

119.    The Holding Company was required to disclose certain financial information about the plan on Schedule I of its Form 5500 filings, including the current value of plan assets and liabilities.

120.    The instructions for completing the financial disclosures state that "liabilities" to be disclosed include "acquisition indebtedness and any other amount owed by the plan."

121.    The Holding Company did not disclose any liabilities on Form 5500 reports filed from 2007 through 2016, thereby falsely indicating that there was no acquisition indebtedness.

122.    The Holding Company was required to disclose plan characteristics by entering applicable Plan Characteristic Codes. On its Form 5500 filings for 2006, 2007, and 2008, the Holding Company entered the following Codes: 2C (for money purchase plan), 2I (for stock bonus plan), 2O (for ESOP other than a leveraged ESOP), and 3E (for prototype plan document). It was not until 2009 that the Holding Company began to enter Code 2P (leveraged ESOP) instead of Code 2O.

123.    The factual allegations herein establish that the ESOP had at least one outstanding loan from 2007 financed by the Holding Company and/or VCB until the Plan was terminated effective as of December 31, 2016.  Defendants failed to disclose the loan on Form 5500 filings, thereby fraudulently concealing the fact that Stock repurchased by the ESOP was financed with one or more loans from the ESOP participants, the Internal Revenue Service, the Department of Labor, and the general public.

124.    Another question for ESOP Form 5500 filers for plan years 2009 through 2018 asks: "Does the ESOP hold any stock that is not readily tradeable on an established securities market?"  Each year during the relevant period the Holding Company's response to this question was "no."

125.    Holding Company Stock is not now, and has never been, "readily tradeable" on an "established securities market." The Holding Company's response fraudulently led ESOP participants, regulatory authorities, and other interested parties to believe ESOP transaction prices were based on reliable market data.

**Defendants' Failure to Act in the Best Interests of ESOP Participants**

126.    For each plan year from 2008 through 2016, VCB contributed ten percent (10%) of each ESOP participant's compensation to the ESOP, as required by the ESOP's money

purchase employer contribution formula. In some (but not all) plan years, VCB also made discretionary contributions to the ESOP in small amounts and paid dividends on ESOP Stock.

127.    The ESOP employer contributions were fully tax-deductible by VCB, as were dividends paid on ESOP Stock.

128.    Plaintiff Moore and other ESOP participants were told by their employer, VCB, that the ESOP contributions were intended to fund their retirement. Each year, however, from 2008 through 2016, all or a significant portion of the money purchase contributions made on behalf of Plaintiff Moore **were applied to pay principal and interest due on the 2008 ESOP Loan**. Upon information and belief, contributions made on behalf of all ESOP participants were applied in the same manner.

129.    At all times during the period from 2008 through 2016, the cost basis of Holding Company Stock allocated to the ESOP Participants' Leverage Share Account was significantly higher than the value of such shares. In effect, a significant portion of all employer contributions from 2008 through 2016 were invested in Holding Company Stock at a cost to the ESOP participants in excess of adequate consideration. For example, during 2013, a $4,999.05 contribution to Plaintiff' Moore's account was allocated to pay the ESOP loan. The shares released to her account had a cost basis of $44.52 per share and a value of $15.50. Stated differently, the ESOP Trustees paid $4,999.05 using contributions intended to fund Plaintiff Moore's retirement to acquire Stock worth only $1,740.52. Upon information and belief, contributions made on behalf of all the Plaintiff Class were applied in the same manner.

130.    Plaintiff Moore and all other ESOP participants would have been better off if the ESOP's Trustees had invested in a money market fund instead of having "purchased," via the

repayment of the illegal 2008 Loan, overpriced shares of Holding Company Stock between 2008 and 2016.

131.    Defendants' breach of fiduciary duties to the ESOP participants is further highlighted by a series of transactions that, as indicated on Form 5500 filings, appear to have occurred between 2013 and 2016.  During those years, it appears the ESOP's Trustees simultaneously "purchased," via the repayment of the illegal 2008 Loan, overpriced shares of Holding Company Stock, while, during the same Plan years, selling shares of Holding Company Stock at the low, then current, prices per share.  For example, during 2013, Defendants purchased shares, via the loan repayment, at $44.52 per share.  During the same year, they appear to have sold shares at a sales price of approximately $15.50 per share. This "buy high, sell low" strategy Defendants appear to have engaged in between 2013 and 2016 is utterly indefensible under ERISA.

132.    Between 2006 and 2008, Defendants could have taken a number of alternative actions that would have been in compliance with ERISA, consistent with the securities laws, and in the best interests of the ESOP and the ESOP participants – and without the likelihood of harm to the ESOP and ESOP participants.  A prudent fiduciary in the same circumstances would not have viewed any of the following alternative actions as more likely to harm the ESOP fund than to help it.  These include:

a.    As required by ERISA, Defendants could have caused the Holding Company, and not the ESOP, to cover the cost of cash distributions to ESOP participants, including themselves and others, in the 2006-2008 timeframe.

b.    If the Holding Company did not have sufficient cash to cover the cost of cash distributions to ESOP participants, including certain of the Defendants such as

Defendant Stone and Defendant Spicer, and others, in the 2006-2008 timeframe, Defendants could have caused the Holding Company, not the ESOP, to obtain a loan to meet the Holding Company's obligations under ERISA.

c.      As required by ERISA, Defendants could have caused cash distributions to ESOP participants, including themselves and others, in the 2006-2008 timeframe to be made at valuations per share of Stock that reflected the fair market value of those shares, instead of a fraudulently inflated value.

d.      As required by ERISA, Defendants could have caused the cash purchase price of any purchases of Stock from the Holding Company, Defendants (directly or indirectly through the Holding Company), and/or other parties, in the 2006-2008 timeframe to have been made at valuations per share of Stock that reflected the fair market value of those shares as of the date of the transactions in question, instead of at a fraudulently inflated value or a value as of a date other than the date of the transactions in question.

e.      If, in the 2006-2008 timeframe, the ESOP did not have sufficient funds to cover the cost of any proposed purchases or repurchases of Stock from the Holding Company from Defendants (directly or indirectly through the Holding Company), and/or from other parties, Defendants could simply not have proceeded with any such purchase instead of securing one or more loans to the ESOP to finance the purchase price.

f.      As noted above, the Holding Company, and not the ESOP, should have borrowed funds from VCB to fund its own repurchase obligations in 2007 and 2008. But, even after having arranged the illegal loans from VCB to the ESOP, the Trustees had alternatives:

(i)    For example, the Holding Company and VCB had full discretionary authority to contribute tax-deductible stock purchase contributions in addition to the money purchase contributions and use such additional contributions to pay off the 2008 ESOP Loan instead of the money purchase contributions.  In other words, the Holding Company could have increased its contributions by the additional amount needed to pay the loan each year above the minimum 10% money purchase contributions.  This would have made the money purchase contributions available for normal ESOP purposes, such as providing cash liquidity to satisfy repurchase obligations or buying stock at its then current fair market value.

(ii)    The Trustees could also have tendered the unallocated Stock held in the Leverage Share Account back to the Holding Company and negotiated a retirement or termination of the loan with VCB.

(iii)    Alternatively, the Trustees could have negotiated a refinancing of the 2007 ESOP Loan and the 2008 ESOP loan to make their terms fair to ESOP participants.

133.    By taking the foregoing alternative actions, none of which a prudent fiduciary in the same circumstances would have viewed as more likely to harm the ESOP fund than to help it, the Defendants and others would not have reaped windfall profits at the expense of the ESOP participants, and the ESOP participants would not have been fraudulently deprived of their retirement benefits.

134.     While the Holding Company and VCB profited from tax-deductible contributions to the ESOP and interest paid on the ESOP loans, the value of the ESOP participant accounts steadily declined in value.

135.     During the ten-year period beginning with the 2007 Plan year until the ESOP was terminated in 2016, over $60,000 was contributed to the ESOP to fund Plaintiff Moore's retirement benefit. Not only did Plaintiff Moore lose every penny of these contributions, but the value of her ESOP accounts diminished in value by an additional $68,000 over and above the aforementioned loss of over $60,000. Upon information and belief, all members of the Plaintiff Class suffered similar losses.

136.     The illegal 2007 ESOP Loan, the illegal 2008 ESOP Loan, and related transactions thus resulted in an unfair windfall to certain Plan participants and fiduciaries, including, based on information and belief, Defendants Stone and Spicer, who, fraudulently trading with inside information knowing that the value of Holding Company shares would likely decline, took cash distributions from the ESOP and/or sold shares to the ESOP at the fraudulently inflated valuation of $55.00 per share or even higher.  VCB, controlled by the same people who controlled the ESOP, was also the recipient of a windfall in the form of interest payments that were virtually guaranteed to be paid.  The windfall profits of Defendants Stone, Spicer, VCB, and others were fully paid for by ESOP participants like Plaintiff Moore, whose retirement funds in the ESOP were eviscerated.

**ESOP Termination Prior to Proposed Merger**

137.     The Board approved a termination of the ESOP effective December 31, 2016.

138.   The ESOP participants were notified of the ESOP termination by written notice dated December 16, 2016. A plan sponsor is required to provide this notice, referred to as an ERISA Section 204(h) notice, to plan participants no later than 45 days prior to the termination.

139.   In July 2017, the Holding Company and Atlantic Bay Mortgage Group announced a merger.

140.   Upon information and belief, the Board became aware of merger possibility in December 2016 and decided to terminate the ESOP so quickly that it could not satisfy the ERISA 204(h) 45-day advance period.

141.   Under the terms of the ESOP, voting rights on a merger transaction must be passed through to the ESOP participants, and the Holding Company is required to provide the ESOP participants financial and other information provided to other shareholders to exercise their voting rights.

142.   Maintaining the ESOP, or at least waiting to terminate the plan immediately prior to the merger instead of several months earlier, would have ensured the ESOP participants not only had voting rights with respect to the transaction but also would have ensured they benefited from the anticipated increase in Holding Company Stock value that the transaction was expected to provide.

143.   Although the termination of the ESOP was not a fiduciary decision for ERISA purposes, it nevertheless serves as further evidence of the callous disregard Defendants had for the interests of the ESOP Participants.

## CLAIMS FOR RELIEF

## COUNT I

### Breach of ERISA Fiduciary Duties (as to all Defendants)

144.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

145.    Defendants Holding Company, VCB, Stone, Spicer, Hodge, and Sedwick breached fiduciary duties that they owed to the ESOP under ERISA, resulting in losses to the ESOP.

146.    Section 404(a)(1)(A) of ERISA requires, among other things, that a fiduciary of a plan discharge his or its duties with respect to the plan solely in the interest of the plan participants and for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the plan.

147.    Section 404(a)(1)(B) of ERISA requires that a fiduciary of a plan discharge his or its duties with respect to the plan solely in the interest of the plan participants and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

148.    Section 403(c)(1) of ERISA requires, in part and subject to certain exceptions, that the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of administering the plan.

149.    Section 404(a)(1)(B) of ERISA prohibits a fiduciary from causing a plan to acquire plan assets for more than adequate consideration. Any such acquisition is a prohibited transaction.

150.     Section 406(a)(1)(B) further provides, in pertinent part, that a fiduciary with respect to a plan shall not cause the plan to engage in a transaction if he knows or should know that such transaction constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest (such as VCB).

151.     Section 408(e) of ERISA provides a conditional exemption from the ERISA prohibited transaction rules for sales of employer securities to or from a plan if a sale is made for (and not more than) adequate consideration. Section 3(18)(B) of ERISA defines adequate consideration as the "fair market value of the asset as determined in good faith by the trustee or the named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." The price paid must reflect the fair market value of the asset and the fiduciary must conduct a prudent investigation to determine the fair market value of the asset.

152.     In addition, the Trustees had a continuing fiduciary duty to monitor Plan investments and remove imprudent ones. *Tibble v. Edison International*, 135 S. Ct. 1823 (2015).

153.     The factual allegations set forth herein establish that Defendants violated each and every one of these basic tenets of ERISA. Specifically, the Trustees (i) failed to follow procedures necessary to determine the fair market value of Holding Company Stock distributed from and sold to the ESOP, (ii) caused the ESOP to pay more than adequate consideration for the repurchase of Holding Company Stock, (iii) failed to discharge their duties with respect to the ESOP **solely** in the interest of the Plan participants and for the exclusive purpose providing benefits to such participants, and (iv) engaged in self-dealing to enrich themselves at the expense of ESOP participants.

154.     As the ESOP Trustees, Defendants Stone, Hodge, and Sedwick had a fiduciary duty to ensure that any transactions between the ESOP and the Holding Company and/or VCB,

44

including loans to the ESOP, acquisitions of Holding Company Stock by the Plan, and all other transactions between them were fair and reasonable, and to the ensure that the ESOP paid no more than fair market value for Holding Company Stock.

155.   The ESOP Trustees breached their fiduciary duty by (a) intentionally concealing material financial information regarding the condition of the Holding Company for the purpose of establishing an inflated price for their ESOP transactions in 2007 and 2008; (b) knowingly and fraudulently causing the ESOP to repurchase Holding Company Stock at inflated prices; (c) actively concealing their fraud and ERISA violations by various means as described above; and (d) approving ESOP loans to finance the acquisition of Holding Company Stock that unnecessarily saddled the ESOP participants with debt.

156.   Defendants serving on the Board of Directors of the Holding Company and/or VCB breached their ERISA fiduciary duties by (a) approving ESOP transactions for the purpose of profiting from such transactions at the expense of the ESOP participants; and (b) unnecessarily saddling the ESOP participants with debt that decimated their retirement benefits.

157.   There was no reason to leverage the ESOP.  By doing so, Defendants intentionally forced the ESOP participants to invest in Holding Company Stock for ten straight years at a price that far exceeded its value.

158.   ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia,* that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

159.    Defendants' breaches of fiduciary duties under ERISA caused losses to the ESOP that approach or exceed $12 million, in an amount to be proven more specifically at trial.

## COUNT II

### Engaging in Prohibited Transactions Forbidden by ERISA (as to all Defendants)

160.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

161.    Defendants Holding Company, VCB, Stone, Spicer, Hodge, and Sedwick, each a party in interest under ERISA with respect to the ESOP, engaged in prohibited transactions forbidden by ERISA, resulting in losses to the ESOP.

162.    The factual allegations establish that Defendants entered into numerous ESOP transactions in 2007 and 2008 that were prohibited transactions under ERISA, including multiple Stock repurchase transactions at prices that exceeded adequate consideration and non-exempt loan transactions.

163.    The Holding Company, VCB, and the individual Defendants are each a "party in interest" under ERISA and therefore any compensation paid to the them in the form of loan interest or otherwise in connection with the 2007 ESOP Loan and the 2008 ESOP Loan was a separate prohibited transaction under ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B). These prohibited transactions were ongoing from 2007 through 2016, when the final contribution was made to the ESOP to retire the Loans.

164.    Defendants prohibited transactions caused losses to the ESOP that approach or exceed $12 million, in an amount to be proven more specifically at trial.

## PRAYER FOR RELIEF

165.    WHEREFORE, Plaintiff prays for judgment against Defendants and the

46

following relief:

a.     Certify this action as a Class action.

b.     Declare that Defendants breached their ERISA fiduciary duties to the ESOP participants.

c.     Declare that Defendants caused the ESOP to engage in prohibited transactions.

d.     Declare that Defendants engaged in prohibited transactions.

e.     Order that Defendants make good to a successor trust established for the ESOP to recoup all losses, including lost earnings on funds that should have been invested prudently, to the ESOP resulting from breaches of ERISA, and restore any profits made by Defendants through the use of ESOP assets to members of the Plaintiff Class by paying such successor trust an amount estimated to approach or exceed $12 million, to be proven more specifically at trial.

f.     Order that Defendants provide other appropriate equitable relief to the Plan, including but not limited to surcharge, providing an accounting of profits, and imposing a constructive trust and or equitable lien on any funds wrongfully held by Defendants.

g.     Award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund.

h.     Order Defendants to pay prejudgment interest.

i.     Award such other and further relief as the Court deems equitable

and just.

## **REQUEST FOR JURY TRIAL IN PART**

166.    Plaintiff requests a jury trial to the extent it is established that the relief

available herein is legal as opposed to equitable in nature.

Dated: August 12, 2019

Respectfully submitted,

JANICE A. MOORE, ON BEHALF OF HERSELF
AND A CLASS OF ALL SIMILARLY SITUATED
PARTICIPANTS IN THE VIRGINIA COMMUNITY
BANKSHARES, INC. EMPLOYEE STOCK
OWNERSHIP PLAN,

By:   _____ */s/* _____
                        Counsel

Harris D. Butler, VSB No. 26483
Zev H. Antell, VSB No. 74634
BUTLER ROYALS, PLC
140 Virginia Street, Suite 302
Richmond, VA 23219
Phone: (804) 648-4848
Fax: (804) 648-6814
Email: harris.butler@butlerroyals.com
Email: zev.antell@butlerroyals.com

Mark J. Krudys, VSB No. 30718
THE KRUDYS LAW FIRM, PLC
919 East Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com

Marie D. Carter, VSB No. 21278
MARIE CARTER, PLC
122 Granite Avenue
Richmond, VA 23226
Phone: (804) 402-4003
Email: mdcarter@benefits-law.com

Jeffrey A. Sanborn, VSB No. 40777
JEFFREY A. SANBORN, ESQ.
835 Summit View Lane
Charlottesville, VA  22903
Phone: (434) 825-7205
Email: jsanborn@sanborn-law.com

*Counsel for Plaintiff Janice A. Moore on Behalf of Herself and a Class of All Similarly Situated Participants in the Virginia Community Bankshares, Inc. Employee Stock Ownership Plan*