# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF VIRGINIA

### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| JANICE A. MOORE, | |
| *Plaintiff*, | CASE NO. 3:19-cv-45 |
| v. | |
| | MEMORANDUM OPINION |
| VIRGINIA COMMUNITY BANKSHARES, INC., *et al.*, | |
| *Defendants.* | JUDGE NORMAN K. MOON |

Plaintiff Janice A. Moore is a former employee of Virginia Community Bank and former participant in its Employee Stock Ownership Plan (ESOP), which was terminated effective December 31, 2016. Defendants Stone, Hodge, and Sedwick served as the ESOP's trustees in the 2006-to-2008-timeframe at issue in this motion. Plaintiff asserts that Defendants breached their fiduciary duties and engaged in transactions prohibited by ERISA.

Defendants move for summary judgment, contending that Plaintiff's original claims were not timely filed. Dkt. 91. Plaintiff argues that the statute of repose for her claims is tolled because Defendants fraudulently concealed their wrongdoing and did nothing to cure the fraudulent concealment before the ESOP's termination on December 31, 2016, nor did they cure it before the final distributions from the ESOP were made in 2018. For the following reasons, the Court will deny Defendants' motion for summary judgment.

1

# I.  Background

Plaintiff is a former employee of Virginia Community Bank ("VCB") and former participant in the Virginia Community Bankshares, Inc. Employee Stock Ownership Plan (the "ESOP" or "Plan"), which was terminated effective December 31, 2016. Dkt. 75 ("Amend. Compl.") ¶¶ 27, 48; Dkt. 78 ("Answer") ¶¶ 27, 48; Dkt. 92 (Ex. A) (Janice Moore ESOP Account Statements); *Id.* (Ex. B) at 2 (Board Resolution Terminating the ESOP). Virginia Community Bankshares, Inc. (the "Holding Company") sponsored the ESOP.[1] Amend. Compl. ¶ 1; Answer ¶ 1. VCB was a wholly owned subsidiary of the Holding Company and a participating employer in the ESOP. *Id.* Messrs. Stone, Hodge, and Sedwick, in the 2006-to-2008-timeframe relevant to this motion, served as the ESOP's trustees. Amend. Compl. ¶ 52; Answer ¶ 52. Mr. Spicer never served as an ESOP trustee, though he did serve as an officer and director of the Holding Company.[2] Amend. Compl. ¶ 31; Answer ¶ 31.

## A.  Allegedly Prohibited Transactions

The Court first describes Plaintiff's allegations regarding Defendants' prohibited transactions. As the motion at issue considers only timeliness of Plaintiff's claims, the Court does not, at this juncture, focus on the parties' disputes regarding whether these transactions were in fact prohibited.

---

[1] On December 15, 2019, the Holding Company and Blue Ridge Bankshares, Inc. merged, leaving Blue Ridge Bankshares, Inc. as the only existing corporation. Amend. Compl. ¶ 2; Answer ¶ 2; Dkt. 29. And VCB merged with Blue Ridge Bank, N.A., a wholly owned subsidiary of Blue Ridge Bankshares, Inc. *Id.* Thus, the Holding Company and VCB no longer exist as legal entities.

[2] Defendant Spicer passed away on July 10, 2022. Dkt. 83. Claims against him have already been dismissed. Dkt. 103.

An ESOP requirement involved investing primarily in Holding Company stock. Dkt. 92 (Ex. C) at 3 (2007 Summary Plan Description). Annually, the ESOP trustees hired an independent appraisal company, which determined the stock's value, and that value was then used to determine the account value of the ESOP's participants, so individuals who retired during the applicable calendar year could be cashed out. Dkt. 92 (Ex. D) at 3 (2001 Plan Document § 4.6; *id.* (Ex. E) at 8 (2001 Plan Adoption Agreement § 4(h)). Plaintiff and all other ESOP participants annually received account statements that showed the value of Holding Company stock in their ESOP account for both that calendar year and the prior calendar year. Amend. Compl. ¶ 58; Answer ¶ 58; Dkt. 92 (Ex. A) (Janice Moore ESOP Account Statements).

Early in 2007, Howe Barnes Hoefer & Arnett ("Howe Barnes") conducted a valuation of Holding Company Stock, which was used to cash out individuals that retired in 2006. Amend. Compl. ¶ 71; Answer ¶ 71; Dkt. 92 (Ex. F) (Howe Barnes Valuation Letter). On March 19, 2007, it valued Holding Company stock at $55 per share for Plan-year 2006. *Id.*[3] "[T]he parties disagree that this was a legitimate and independent valuation as required under ERISA," and while "[t]he Defendants posit the 2006 valuation as being unremarkable," the Plaintiff disagrees. Dkt. 95 at 10.

Plaintiff points out several facts supporting that the 2006 Howe Barnes valuation was fraudulent. First, Davenport Financial Advisors, LLC—rather than Howe Barnes—conducted the annual independent valuation each year before and after the 2006 plan year. Howe Barnes only

---

[3] The 2007 Valuation Letter stated that the valuation was based on "Statements of Condition and Income for December 31, 2006," "information . . . pertaining to the past operating history of the company, previous trades of the company's common stock, and other information relevant to this assignment," and an examination of "the financial records of the company and its subsidiary bank, including but not limited to, their earnings history, financial condition, operating environment, trading pattern and future prospects." Dkt. 92 (Ex. F) at 2 (Howe Barnes 2007 Valuation Letter).

did it once for the 2006 plan year. And, significantly, while the 2006 Howe Barnes valuation was dated March 30, 2007, audited financial statements did not become available until March 30, 2007. Dkt. 95 at 10; *id.* (Ex. 3) (2006 Annual Report); *see also* Dkt. 92 (Ex. G) at 11, 26 (Davenport Appraisal Report August 2008) (showing that annual valuations in other years were conducted after audited financials were available for the applicable plan year). Further, the Howe Barnes valuation stated that it was requested to provide a valuation of 75,000 shares, representative of 10% of the Holding Company's issued and outstanding shares, but the ESOP trust held only 145,237 shares as of December 31, 2006. Dkt. 95 at 10; *id.* (Ex. 4) (2006 Accounting Statements). The Davenport reports were also much longer—while Howe Barnes' 2006 evaluation was just 2 pages, the 2008 Davenport report was 28 pages. Dkt. 95 at 11; Dkt. 92 (Ex. F) (Howe Barnes Valuation); *id.* (Ex. G) (Davenport Appraisal Report August 2008). And further still, the $55 value that Howe Barnes assigned to the period ending December 31, 2006 was 21% higher than the $45.30 value for December 31, 2005, which was on Plaintiff's 2006 ESOP statement. Dkt. 95 at 11; *id.* (Ex. A) at 2. Plaintiff also argues that Defendant Stone was attempting to manipulate the 2007 stock price "to justify the fraudulent appraisal." Dkt. 95 at 11.[4]

In 2008, Davenport Financial conducted a valuation of Holding Company Stock, which was used to cash out individuals that retired in 2007. Dkt. 92 (Ex. G) (Davenport Appraisal

---

[4] Plaintiff raises that Defendant Stone, on September 28, 2007, emailed the following message to Otto Williams at Davenport: "our esop will buy all it can of our stock at $55 and noted that its being valued at $42.50, do you know if there was a trade at that price. Should you have any more to sell, would you call me, thanks." Dkt. 95 at 11; *id.* (Ex. 5) (Pierce Stone Emails). And after receiving this message, Davenport officers and personnel discussed via email "market manipulation." *Id.* at 2–4.

Report August 2008). On August 13, 2008, Davenport Financial valued Holding Company Stock at $39.15 for Plan-year 2007. *Id.* at 19.

In 2007, six participants who retired or terminated in 2006 took cash distributions from the ESOP at $55.00 per share, for a benefit totaling $1,476,165.[5] *Id.* (Ex. H) at 2 (April 25, 2017, Letter from CEO Moore). The ESOP lacked sufficient cash to meet these distribution obligations, so the ESOP took a one-million-dollar loan from the Holding Company to cash out these six employees. *See id.* Before the loan, the ESOP had no liabilities. Dkt. 95 at 7.

In 2008, two more participants took cash distributions, this time at the December 31, 2007 valuation of $39.15 per share, making the total distribution amount $1,110,527. Dkt. 92-1 ("Schick Decl.") ¶ 11; Amend. Compl. ¶ 70; Answer ¶ 70. These participants were not defendants. Schick Decl. ¶ 11. And the ESOP refinanced the loan in the amount of two-million dollars to pay out these two participants, as it again lacked sufficient cash. *Id.*

In 2008, the Holding Company's annual report stated:

> The 2007 consolidated financial statements have been restated to properly reflect the leveraging of the ESOP. On July 27, 2007, the ESOP borrowed $1 million for the purpose of liquidating 20,739 shares of Company stock. While the 20,739 shares were still held by the ESOP, as of December 31, 2007, they were not allocated to participants as of that date. The proper treatment is to reflect this transaction as Unearned ESOP Shares within the equity section rather than as an asset of the Company.

Dkt. 92 (Ex. K) at 4 (2008 Annual Report). At the time, Plaintiff, as a shareholder, received the Company's annual reports. *Id.* (Ex. OO) at 101:12–102:5 (Moore Dep.). Each annual report after the above, through 2016, included a line item noting the value for "Unearned ESOP Shares" or "Unreleased Shares."[6] "In 2008, the Defendants added another $1,000,000 to the ESOP debt."

---

[5] Spicer, who has been dismissed from this case, was one such participant. Declaration of Amy Schick ("Schick Decl.") ¶ 10.

[6] *See id.* (Ex. L) at 4 (2009 Annual Report); *id.* (Ex. M) at 4 (2010 Annual Report); *id.* (Ex. N) at 4 (2011 Annual Report); *id.* (Ex. O) at 4 (2012 Annual Report); *id.* (Ex. P) at 4 (2013

Dkt. 95 at 8 (citing Dkt. 92 at 10). And "the Defendants falsely reported net plan assets as of December 31, 2008, as $4,806,770, as opposed to the accurate amount, $2,806,770." *Id.* (citing Dkt. 92 (Ex. NN) at 6). The ESOP, per Defendants, was over $2,000,000 in debt by the end of 2008, including account interest. *Id.*

In 2007 and 2008, the Holding Company provided the ESOP a cash advance, structuring it as a loan. *Id.* at 8–9 (citing Dkt. 92 (Ex. I); *id.* (Ex. J)). Plaintiff's account statements, beginning in 2008, started reflecting an allocation of the 10% of compensation contributed to her account applied to pay the loan, and she argues that in 2010 "nearly 100% of the cash that *should* have been allocated to [her] ESOP money purchase cash account was *instead* used to pay the Loan." *Id.* at 9 (citing Dkt. 92 (Ex. A)) (emphasis in original). And Plaintiff "received a small allocation of shares released from the leveraged share account," in return for the payments. *Id.* (citing Dkt. 92 (Ex. A)).

Plaintiff argues that, "notably omitted from Defendants' recitation of the facts is recognition that, in addition to the 2007 and 2008 prohibited transactions, Defendants engaged in a third prohibited transaction on February 13, 2013, when they extended the Loan term for an additional five years." *Id.* at 12 (citing *id.* (Ex. 1)).

## B. Plaintiff's Knowledge of Allegedly Prohibited Transactions: Information Provided to Her

The parties dispute whether Plaintiff should have known of the prohibited transactions within six years after they occurred. Plan sponsors must annually complete and file a form 5500 with the Department of Labor ("DOL"), i.e., "an important compliance, research, and disclosure tool for the [DOL], a disclosure document for plan participants and beneficiaries, and a source of

---

Annual Report); *id.* (Ex. Q) at 4 (2014 Annual Report); *id.* (Ex. R) at 4 (2015 Annual Report); *id.* (Ex. S) at 4 (2016 Annual Report).

information and data for use by other Federal agencies, Congress, and the private sector in assessing employee benefit, tax, and economic trends and policies."[7] Sponsors must enter "all applicable plan characteristic codes" from the "List of Plan Characteristic Codes that describe the characteristics of the plan being reported" on line 8a. *See, e.g.*, Dkt. 92 (Ex. T) at 3 (2009 Form 5500 Instructions). Plaintiff asserts that Defendants failed to comply with other disclosure requirements, including failing to "file Schedule E, applicable to all ESOPs, for the 2007 plan year;" "disclose the loan on the Schedule E filed for the 2008 plan year;" "disclose the dollar amount of the loan liability on line 1b 'Total plan liabilities' of Schedule 1 (which is used to disclose Financial Information regarding the plan), thereby falsely indicating that there was no debt;" or "respond 'yes' to the ESOP disclosure question on Schedule R asking, 'Does the ESOP hold any stock that is not readily tradable on an established securities market.'" Dkt. 95 at 16–17 (citing Dkt. 92 (Exs. U, V, W, X, Y, Z, AA, BB, KK, NN)).[8] Per Plaintiff, "[i]f the liabilities for the loan had been accurately reported on Form 5500 filings, as was required, the 2007 Form 5500 would have reported $5,371,441 as net plan assets as of December 31, 2007, instead of fraudulently reporting $6,371,441." *Id.* at 8 (citing Dkt. 92 (Ex. KK) at 6). And "this liability was in addition to the $1,033,379 loss the ESOP suffered in 2007 due to the steep decline in stock value." *Id.* (citing Dkt. 92 (Ex. KK) at 6).

---

[7] *Form 5500 Series*, U.D. Dep't of Labor, Employee Benefits Security Administration, https://dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500 (last visited Mar. 13, 2023).

[8] Plaintiff also argues that Defendants responded to the Compliance Questions in Part II of the Form 5500 filings by "falsely disclos[ing] on line 4g of each filing that there were no nonexempt transactions with any party in interest," arguing that both criminal and monetary penalties thus apply. Dkt. 95 at 17 n.5 (citing 18 U.S.C. § 1027 (as amended by § 111 of ERISA)).

Between 2009 and 2016, every Form 5500 that the ESOP filed included on line 8a Code 2P.[9] Code 2P from the Plan Characteristic Codes denotes that a plan is a "Leveraged ESOP – An ESOP that acquires employer securities with borrowed money or other debt-financing techniques." Dkt. 92 (Ex. T) at 4 (2009 Form 5500 Instructions).

While the parties agree that the ESOP statements included a "Leverage Share Account" section that "disclosed the share value as of the beginning and end of the plan year," they disagree that this constitutes "an adequate disclosure to ESOP participants regarding an ESOP plan loan contemplated by ERISA and expected of plan fiduciaries."[10] Dkt. 95 at 15 (citing Dkt. 92 at 13).

For her part, Plaintiff testified that she "never even heard of" a Form 5500 prior to filing her Complaint. Dkt. 92 (Ex. OO) at 104:2–17 (Moore Dep.). However, plan sponsors must provide Plan participants with a Summary Annual Report ("SAR") or an annual summary of a plan's Form 5500.[11] Plaintiff acknowledged in her deposition that ESOP participants routinely receive a SAR. Dkt. 92 (Ex. OO) at 112:12–17 (Moore Dep.). And each SAR they received included a "Your Right To Additional Information" section. *E.g.*, Dkt. 92 (Ex. CC) (2011 ESOP SAR), which communicated their right to request and obtain additional information.[12] But

---

[9] Amend. Compl. ¶ 128; Answer ¶ 128; Dkt. 92 (Ex. U) at 3; *id.* (Ex. V) at 3; *id.* (Ex. W) at 3; *id.* (Ex. X) at 3; *id.* (Ex. Y) at 3); *id.* (Ex. Z) at 3); *id.* (Ex. AA) at 3; *id.* (Ex. BB) at 5 (Forms 5500, Lines 8a).

[10] Plaintiff also states in relation to this that Defendant Stone sent ESOP participants a memo on October 1, 2008, which accompanied their 2007 ESOP account statements and "does not mention anything at all about the Loan or the 'leveraged account' that had suddenly appeared on the ESOP statements." Dkt. 95 (citing *id.* (Ex. 8) (2008 Memo from Pierce Stone).

[11] *Plan Information*, U.S. Dep't of Labor, https://www.dol.gov/general/topic/retirement/planinformation (last visited Mar. 13, 2023).

[12] *Id.* at 2 ("You have the right to receive a copy of the full annual report [Form 5500], or any part thereof, on request."); *id.* ("You also have the right to receive from the plan

Plaintiff, despite receiving the SARs, never requested any additional information. Dkt. 92 (Ex. OO) at 113:17–25 (Moore Dep.). She testified that she understood participants could view the ESOP documents at VCB's corporate office, but she could not remember asking to review or copy them, *id.* at 33:8–16, nor did she request a copy of any Plan-related documents otherwise. *Id.* at 112:18–113:20.

VCB's CEO, Preston Moore (of no relation to Plaintiff), sent a letter to all ESOP participants, along with their 2012 ESOP account statements, on June 28, 2013. Dkt. 92 (Ex. DD) (June 28, 2013, Letter from CEO Moore). His letter explained that the ESOP had taken a loan to cash out retiring participants, which he further explained to participants by visiting each VCB branch in 2012. *Id.* The letter also stated: "The shares that are being purchased by the bank for your account are the $44.50 price, however, not the current market price. This must continue until the loan is paid back." Dkt. 95 at 17 (quoting Dkt. 92 (Ex. DD)) Plaintiff received the letter and asked no questions. Dkt. 92 (Ex. OO) at 60:3–9, 67:7–10.

## C. Plaintiff's Knowledge of Allegedly Prohibited Transactions: Seeking Further Information

Plaintiff later asked questions about the ESOP. Around September 2016, she asked Amy Schick, VCB's Senior Vice President of Human Resources and then-Corporate Secretary, to deliver CEO Moore her seven "questions concerning our ESOP," which included questions regarding the loan and collateral ESOP shares. Amend Compl. ¶ 57; Answer ¶ 37; Dkt. 92 (Ex. EE) (Sept. 2016 Questions Concerning Our ESOP). CEO Moore responded to her on September

---

administrator, on request and at no charge, a statement of the assets and liabilities of the plan and accompanying notes, or both."); *id.* at 3 ("You also have the legally protected right to examine the annual report at the main office of the plan (Virginia Community Bankshares, Inc., P.O. Box 888, Louisa, WA 23093) and at the U.S. Department of Labor in Washington, D.C., or to obtain a copy from the U.S. Department of Labor upon payment of copying costs.").

14, 2016, writing that he "noted before that the ESOP has been paying off the ESOP loan made

back in 2007 through bank contributions to the ESOP. As the ESOP loan is paid off, shares that

were held in a special escrowed stock account as collateral for the ESOP loan, are released and

allocated to participants in accordance with the terms of the ESOP." Dkt. 92 (Ex. FF) at 2 (Sept.

14, 2016) (Letter from CEO Moore). The ESOP was terminated on December 31, 2016. Amend.

Compl. ¶ 48; Answer ¶ 48. And on February 26, 2017, Plaintiff sent a letter to CEO Moore

"concerning the termination of the Virginia Community Bank's ESOP," complaining about her

ESOP account's post-2006 market value decline. Dkt. 92 (Ex. GG) at 2–4. He responded via a

letter dated April 25, 2017, explaining the reason for the 2007 loan and stating:

> An independent valuation firm determined that the valuation for shares held by the Plan
> as of December 31, 2006 was $55.00 per share. The valuation was communicated to the
> Plan via a letter dated March 19, 2007. For the six participants who retired or terminated
> employment in 2006, this $55.000 valuation was used for their distributions.

Dkt. 92 (Ex. H) at 2–3 (Apr. 25, 2017, Letter from CEO Moore).

Plaintiff takes issue with this letter as "support[ing] a 'factual' conclusion that *the ESOP*

had an 'obligation' to satisfy cash distributions from the ESOP." Dkt. 95 at 12 (citing Dkt. 92 at

11) (emphasis in original). Plaintiff explains that such an obligation is often known as the ESOP

plan sponsor's "repurchase obligation." *Id.* (citing The ESOP Repurchase Obligation Handbook,

published by the National Center for Employee Ownership (5th Ed. 2018)). Under the ESOP

plan document terms, a participant can request that her ESOP account distribution be made in

cash. *Id.* (citing Dkt. 95 (Ex. 6) at 1 (ESOP Plan Documents)). And this requires that stock

invested in the ESOP be converted to cash, for which Defendants had three alternative

conversion methods, none of which included making a cash advance loan to the ESOP. *Id.* at 12–

13.

Plaintiff also asserts that the letters she received beginning in 2007 made false representations regarding that (1) the 2007 $55.00 per share valuation "was determined pursuant to a legitimate 'independent valuation,'" (2) "the Plan can obtain a loan to satisfy the distribution obligation," and (3) "[t]here is nothing inappropriate about this decision. Such loans are authorized by Federal law and the Plan document." *Id.* at 18–19 (quoting Dkt. 92 at 16, *id.* (Ex. H) at 3).

Plaintiff also submitted complaints to the Federal Reserve and DOL. In a letter dated April 25, 2013, Plaintiff wrote to Margaret McCloskey Shank, Deputy Secretary of the Board of Governors of the Federal Reserve System, stating: "I believe that a lot of the bank's profits were used for personal activities and expenses and that is why there were no funds available when 3 of our Vice Presidents retired and the bank had to do a loan to pay them." Dkt. 92 (Ex. HH).[13] She sent a series of letters to Keith Graham at the DOL, Employee Benefits Security Administration, between May 2017 and June 2018, (1) requesting that the DOL investigate VCB, and (2) discussing complaints about the ESOP. Dkt. 92 (Ex. II) (Janice Moore Letters to DOL).[14]

Plaintiff testified that she heard from a coworker "that [Defendant] Stone would get upset if the employees asked questions about the ESOP," but she never personally experienced anger from him with respect to the ESOP. Dkt. 92 (Ex. OO) at 29:3–4 (Moore Dep.).[15] She further

---

[13] In her deposition, Plaintiff testified that she neither knew Ms. Shank's position nor could recall why she contacted Ms. Shank. Dkt. 92 (Ex. OO) at 48:7–52:8 (Moore Dep.). She also testified in her deposition that she did not know if a loan actually existed and "just guessed" one did. *Id.* at 56:15–22.

[14] Plaintiff's deposition testimony conveyed that she believes the DOL engaged in an investigation subsequent to her letters but has no insights into it. Dkt. 92 (Ex. OO) at 118:17–119:20 (Moore Dep.).

[15] Defendants argue that Plaintiff's statement regarding Defendant Stone's "'obfuscation' directly contradicts her contention that he 'exhibited anger' toward participants who inquired about the ESOP" because, as she testified, "when she asked questions about the decrease in her

testified that she had no direct eyewitness knowledge of any employee termination or retaliation for asking about the ESOP and that she "did not have any factual basis" to believe she was retaliated against for asking about the ESOP. *Id.* at 79:15–18, 80:9–13, 121:10–122:9. However, she also testified that two bank employees had direct knowledge that her colleague, Andrew Wade, was terminated for inquiring about the ESOP. Dkt. 95 at 21–22 (citing Dkt. 95 (Ex. 9) at 123:15–123:24 (Moore Dep.)).

### D.  Procedural History

Plaintiff filed suit on August 12, 2019. Dkt. 1. Judge Glen E. Conrad denied Defendants' motion to dismiss in June 2020. Dkt. 45. Magistrate Judge Hoppe granted leave to file an Amended Complaint, Dkt. 73, which was filed in March 2022. Dkts. 74, 75. Thereafter, Defendants filed the motion for summary judgment at issue before the Court. Dkt. 91. Defendants subsequently filed a motion to dismiss Plaintiff's prohibited transaction and fiduciary breach claims arising on or after August 24, 2018, pursuant to Fed. R. Civ. Pro. 12(b)(1) for lack of Article III standing, Dkt. 100, which the Court will address in a separate opinion.[16]

### II.      Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable [fact finder] could return a verdict for the nonmoving party," and "[a]

---

ESOP account value, [Defendant] Stone blamed it on the market and tried to show her evidence that he had also lost money due to decreases in the Holding Company's valuation during and after the 2007–2007 financial crisis," rather than testifying that he exhibited anger." Dkt. 92 at 32 (citing Dkt. 92 (Ex. OO) at 88:17–23 (Moore Dep.)).

[16] Plaintiff has also filed a motion to certify a class, pursuant to Fed. R. Civ. Pro. 23. Dkt. 98.

fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

The moving party bears the burden of establishing that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, it must present sufficient evidence such that a reasonable fact finder could find by a preponderance of the evidence for the non-movant. *See Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 818 (4th Cir. 1995). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc.*, 888 F.3d at 659.

### III.     Analysis

Defendants argue that Plaintiff's claims that they breached their fiduciary duties to the ESOP plan participants are untimely. Dkt. 92. Plaintiff counters that her claims were timely filed. Dkt. 95 at 26–46. In considering whether Plaintiff's claims were timely, the Court will first calculate the limitations period. Then, it will determine whether there is a genuine issue of material fact on the issue of whether Defendants tolled the statute of repose by preventing Plaintiff from discovering their alleged breach of their fiduciary duties, due to fraud or concealment.

### A.  Calculation of the Limitations Period

Under ERISA, the statute of repose for breaches of fiduciary duty states that "[n]o action" for breach of fiduciary duty "may be commenced" after the earlier of "six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of

an omission the latest date on which the fiduciary could have cured the breach or violation."

ERISA § 413(1); 29 U.S.C. § 1113(1).[17] And the "'fraud or concealment' provision extends the

statute of limitations period to six years beginning on the date of discovery," i.e., "'until the

plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged

fraud or concealment.'" *Browning v. Tiger's Eye Benefits Consulting*, 313 F. App'x 656, 663

(4th Cir. 2009) (unpublished) (quoting *J. Geils Band Employee Benefit Plan v. Smith Barney

Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996) (internal citation omitted)).

The statute specifies that the "last action" constituting "part of" the breach or violation or

the "latest date" on which the breach or violation by omission could have been cured, needs to

have occurred within the six-year limitations period. 29 U.S.C. § 1113(1); *see also David v.

Alphin*, 704 F.3d 327, 339 (4th Cir. 2013) ("[T]he limitations period begins running 'when a

specific event occurs, regardless of whether a cause of action has accrued or whether any injury

has resulted.'") (internal citations omitted); *Brincefield v. Studdard*, No.3:17-cv-718, 2018 WL

6323071, at *5 (E.D. Va. 2018) (concluding that the "last action" constituting a breach "occurs

when loan funds are disbursed") (internal citations and quotation marks omitted).

In this case, the latest date on which a breach or violation of a trust like the ESOP could

have been cured is its complete termination, Restatement of Trusts, 564-B:10-1005(c), which

occurred as of December 31, 2016. Dkt. 95 at 27 (citing Dkt. 92 (Ex. B) at 2); *see also Tibble v.

Edison Int'l*, 575 U.S. 523, 528–29 (2015) ("In determining the contours of an ERISA

fiduciary's duty, courts often must look the law of trusts."). Plaintiff received her final

distribution on August 23, 2018, less than one year before filing this action. Dkt. 95 at 27 (citing

_____

[17] If a plaintiff has "actual knowledge of the breach or violation," then a statute of
limitations period of "three years after the earliest date on which the plaintiff had actual
knowledge" applies. 29 U.S.C. § 1113(2).

Dkt. 95 (Ex. 2)). Thus, Defendants could have corrected their prohibited distribution at least until December 31, 2016.[18]

Plaintiff filed suit on August 12, 2019. Thus, her claims are timely if a genuine issue of material fact for either of the following is established: (1) Defendants breached or violated their ERISA fiduciary duties after August 2, 2013, or if Defendants breached or violated their fiduciary duties by omission and did not cure the breach by the six-year period ending, at the earliest, December 31, 2016; or (2) she had not discovered Defendants' breach of their fiduciary duties until after August 12, 2013, due to Defendants' fraud and concealment of the alleged fact that the losses she suffered to her ESOP account value occurred because Defendants engaged in a prohibited transaction.

### B. There is a Genuine Issue of Material Fact Regarding Defendants' Fraud and Concealment Preventing Plaintiff from Discovering the Breach

The Court first recognizes that, at this stage of litigation, Defendants deny that the alleged prohibited transactions occurred, and for the purposes of this motion, argue that even if they did occur, ERISA's six-year statute of repose bars Plaintiff's claims. They contend that Plaintiff fails to carry her burden of proving fraudulent concealment to toll this statute of limitations. But Plaintiff has introduced sufficient evidence to establish a genuine issue of material fact regarding this issue.

The Fourth Circuit has held that the ERISA provision at issue "encompasses at a minimum the 'fraudulent concealment doctrine,'" but the Fourth Circuit has not decided whether fraud alone constitutes 'fraud or concealment.' *Browning*, 313 F. App'x at 663, 663 n.4 (internal

---

[18] Further, as Plaintiff asserts, they could have corrected their prohibited transaction up to the date final distributions from the ESOP were made in 2018. Dkt. 95 at 27.

citations omitted).[19] At the motion to dismiss stage, Judge Conrad held that it was not necessary to determine how to interpret the "fraud or concealment" phrase in ERISA's statute of limitations because Plaintiff's claim easily survived under any standard. Dkt. 44 at 12. That still is the case. Taking the facts in the light most favorable to the nonmoving party, Plaintiff has established more than a genuine issue of material fact that the statute of limitations should be tolled based on *either* a "fraud or concealment" or "fraudulent concealment" standard.

First, Plaintiff argues that the underlying claim is fraud. In the circuits that hold that either fraud or concealment tolls the ERISA statute of repose, the fraud or concealment tolling provision applies if the underlying breach involves "a false representation of a matter of fact, whether by words or conduct, by false or misleading allegations or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury." *Fulghum v. Embarq Corp.*, 785 F.3d 395, 415 (10th Cir. 2015) (quoting *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 189 (2d Cir. 2001) (internal citations omitted)).

Defendants argue that the fraudulent concealment doctrine tolls the ERISA § 413 statute of limitations only as to those defendants shown to have engaged in concealment. *Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1401–02 (9th Cir. 1995) ("Substantial authority indicates, however, that the exception applies only when the defendant himself has taken steps to hide his breach of fiduciary duty."); *Harris v. Koenig*, 722 F. Supp. 2d 44, 61 (D.D.C. 2010) ("[T]he fraudulent concealment doctrine, which grew out of equitable estoppel, tolls the statute of limitations in § 413 only as to those defendants alleged to have committed the concealment.")

---

[19] Circuits are divided as to whether ERISA's "fraud or concealment" language should be read to mean "fraudulent concealment," and Defendants argue that the Court should interpret ERISA's text to include the term "fraudulent concealment" to the exclusion of the statute's word choice: "fraud or concealment." Dkt. 92 at 23–24; Dkt. 95 at 36. The Court need not weigh in on this circuit split, as Plaintiff satisfies either standard.

(internal citations omitted). So a plaintiff "may not generally use the fraudulent concealment by one defendant as a means to toll the statute of limitations against other defendants." *Barker*, 64 F.3d at 1402 (internal citations and quotations omitted). Defendants argue that the only individual who Plaintiff contends engaged in fraudulent concealment is [Defendant] Stone, who she asserts would become 'angry' about questions relating to the ESOP." Dkt. 92 at 20 n.15 (citing Amend. Compl. ¶¶ 101, 103). Defendants claim she offers no evidence to support this allegation, and she "does not identify *any* affirmative acts of purported concealment committed by any other defendant." *Id.*

But the following facts support that a reasonable factfinder could find that Defendants engaged in concealment, as well as fraud: Plaintiff asserts that Defendants engaged in a prohibited transaction first in 2007 when they had the ESOP borrow one-million dollars from the Holding Company for the disallowed purpose of cashing out Mr. Spicer and other Plan participants. Dkt. 95 at 35 (citing Dkt. 92 at 10). According to Plaintiff, Defendants did not promptly correct this transaction—instead, they refinanced the loan for $2 million in 2008 to pay out two more participants. *Id.* (citing Dkt. 92 at 13). They thus left the ESOP participants with an additional one-million dollars in debt. *Id.* And both the original and refinanced loan had a five-year term with all payments of principal and interest due by December 31, 2012. *Id.* (citing Dkt. 92 (Ex. J)). In 2012, Defendants extended the term of the loan for five more years, until December 31, 2017. Dkt. 95 at 36; *id.* (Ex. 1). And Plaintiff contends that Defendant Moore's June 2013 letter to the ESOP participants shows Defendants' awareness that the loan was causing serious losses. Dkt. 95 at 36. Despite this awareness, and considering the evidence in the light most favorable to the nonmoving party, the prohibited transaction was not corrected/cured. Further still, a reasonable factfinder could find that Defendants concealed material information

that would affect the valuation in the 2007 letter from Howe Barnes because (1) the valuation was performed before audited financial statements were available, (2) the valuation covered only 10% of the shares held by the ESOP trust, and (3) the report was very short and assigned a value above what was listed on Plaintiff's 2006 ESOP statement.[20]

Even if Defendants' underlying fraud does not toll the statute of repose, Defendants' ongoing concealment efforts do. Establishing fraudulent concealment requires that the plaintiff shows: "(1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 548 (4th Cir. 2019) (internal citations and quotations omitted). Plaintiff asserts that Defendants "engaged in *per se* prohibited transactions based on a falsely obtained valuation: transactions that they then lied about, hid from the plan participants and government agencies, and concealed from being discovered for years." Dkt. 95 at 41. Defendants address that "she provides no legal support" for her assertion that Defendants engaged in "*per se* fraudulent concealment because they were financed using a 'back-to-back' loan," and "[n]othing in ERISA or the Internal Revenue Code prohibits 'back-to-back' loans to an ESOP." Dkt. 92 at 22.[21]

At the motion to dismiss stage, Judge Conrad held that Plaintiff's allegations of "intimidation and retaliation against employees who investigated the ESOP," ultimately

---

[20] A reasonable factfinder could also find significant that the valuation was conducted by a different independent evaluator than the years directly before and after. Dkt. 95 at 39–40.

[21] Defendants also raise that "Congress recently amended the Small Business Administration's ('SBA') lending program to specifically permit the SBA program to make back-to-back ESOP loans, in recognition of the standard industry practice among larger corporations." Dkt. 92 at 20 (citing *The John S. McCain National Defense Authorization Act for Fiscal Year 2019*, Pub. L. No. 115–232, § 862).

"satisfie[d] the first element of the fraudulent concealment test." Dkt. 44 at 12. Defendants argue that Plaintiff only makes vague general assertions of fraudulent concealment. Dkt. 92 at 27. But Plaintiff does more than this, as she "testified that her information came from Daniel Carter and that Mr. Carter got some of his information from Ronnie Spicer." Dkt. 95 at 41 (citing Dkt. 95 (Ex. 8) at 29–30). And "[s]he further testified that another employee, Tom Filer, provided some information to Daniel Carter." *Id.* (citing Dkt. 95 (Ex. 9) at 32). In doing so, she indicated that multiple coworkers informed her of intimidation that occurred. *See id.*

Regarding the second element of the fraudulent concealment test, Plaintiff asserts that Defendants, as discussed above, "sent out numerous communications to [Plaintiff] Moore and other Plan participants that misrepresented the nature of the loan," and the misrepresentations also appeared on forms filed with the DOL. *Id.* at 42. Also, per Plaintiff, "Defendants lied to plan participants and told them that the Loan was a legally required action." *Id.*

Plaintiff reiterates that Defendants mischaracterize the allegations against them regarding the Form 5500s. *Id.* at 42 (citing Dkt. 92 at 30–32). Plaintiff explains that the problem is *not* Defendants' failure to disclose that the ESOP was leveraged but rather that "it is Defendants' repeated pattern, year over year, of providing incomplete, misleading, and inaccurate information on Form 5500 filings, which prevented Ms. Moore, other plan participants, and a plan participant's primary advocate, the DOL, from discovering ERISA violations, that constitutes concealment." *Id.* at 42–43. Defendants did not disclose on the Form 5500s any liability for the 2007–08 to 2016 loans, and though ESOPs are required to use the accrual method of accounting, Defendants did not heed this requirement and did not disclose any Plan liabilities.[22] Their

---

[22] *See* Financial Accounting Manual for Federal Reserve Banks, https://www.federalreserve.gov/aboutthefed/financial-accounting-manual-for-federal-reserve-banks.htm; Commission Statement of Policy Reaffirming the Status of the FASB as a Designated

concealment of the liabilities prompted that Plan participants and the DOL "were unaware of the immense debt the ESOP 'owed' that was being improperly paid off with Plan assets – assets that should have been funding retirement benefits." *Id.* at 43. Plaintiff also asserts four other fraudulent Form 5500 disclosures:

(i)   failing to answer 'yes' to question 4.d on Schedule 1 ("Were there any non-exempt transactions with a party-in-interest"?);

(ii)  failing to submit Schedule E in 2007 and 2008, as required for all ESOPS;[23]

(iii) failing to respond at all to question 11.b on Schedule R about the structure of the loans; and

(iv)  disclosing that Holding Company stock was readily tradeable on an established securities market in response to question 11 on Schedule R, when in fact it was not.

*Id.*

Plaintiff argues that none of the documents provided by Defendants put Plaintiff on notice, and even if they had, "*there is no proper method to disclose an illegal loan*." *Id.* at 44 (emphasis in original). The Fourth Circuit has recognized that determining whether a plaintiff exercised reasonable diligence "should be decided by the finder of fact and is not amenable to resolution on the pleadings or at summary judgment." *Edmonson*, 922 F.3d at 558. So, at this stage of litigation, Plaintiff survives even the third element of the *Edmonson* test—due diligence. *Id.* at 548.

### IV.   Conclusion

---

Private-Sector Standard Setter, Release Nos. 83-8221; 34-47743, IC-26028; FR-70 (April 25, 2003), 68 FR 23333 (May 1, 2003).

[23] *See* Answer ¶ 124 (showing the DOL has no record of receiving Schedule E from Defendants).

For the foregoing reasons, Defendants' motion for summary judgment on timeliness of the Plaintiff's claims fails.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this __30th__ day of March, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE